The NEW ALLIANCE PARTY OF ALABAMA; Michael Jeter; and Nathaniel Ivory, Plaintiffs–Appellees,

v.

Perry A. HAND, Secretary of State for the State of Alabama, Defendant–Appellant.

No. 90–7680.

United States Court of Appeals, Eleventh Circuit.

June 24, 1991.

---

James H. Evans, Atty. Gen., Jeffery H. Long, Asst. Atty. Gen., Montgomery, Ala., for defendant-appellant.

David Schoen, Montgomery, Ala., for plaintiffs-appellees.

Before KRAVITCH and JOHNSON, Circuit Judges, and MORGAN, Senior Circuit Judge.

PER CURIAM:

 The judgment of the district court is affirmed on the basis of the district court's dispositive opinion which appears below.

AFFIRMED.

MEMORANDUM OPINION OF THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA

This cause comes before the Court on plaintiffs' request for preliminary and permanent injunction and declaratory relief. A consolidated hearing on the request for preliminary injunction and trial on the merits was conducted on August 14, 1990, pursuant to Rule 65(a)(2), Federal Rules of Civil Procedure. Plaintiffs submitted a post-trial brief on August 21, defendant filed a response brief and submitted additional evidence [1] on August 28, and amended such additional evidence on August 29. Plaintiffs submitted a reply brief on August 30. Upon consideration of the evidence and the arguments presented, and for the reasons stated herein, the Court determines that plaintiffs' request for declaratory and injunctive relief is due to be granted. A separate judgment will be en-

---

1. At the trial on the merits, the parties requested and the Court allowed that any evidence which the parties might wish to submit subsequent to the hearing but during the briefing period would be allowed due to the expedited nature of the proceedings.

tered in accordance with this Memorandum Opinion.

## JURISDICTION AND VENUE

Plaintiffs bring this action pursuant to 42 U.S.C. § 1983, alleging a violation of the First, Fourteenth and Fifteenth[2] Amendments to the United States Constitution. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and venue is correct pursuant to 28 U.S.C. § 1391(b).

## FACTS

Plaintiff New Alliance Party of Alabama (NAP) seeks to have itself and its candidates placed on the ballot for the November 6, 1990 general election in Alabama. The candidates are plaintiff Michael Jeter, who wishes to run for the office of Commissioner (District 1) for the County Commission of Jefferson County, Alabama and plaintiff Nathaniel Ivory, who wishes to run for the office of United States Congressman for the Sixth United States Congressional District in Alabama. Bob Friedman, a field organizer for plaintiff NAP, began his efforts to obtain ballot access for plaintiff NAP in November, 1989. At that time he was aware that pursuant to Alabama statute the party would be required to submit signature petitions and certification of its nomination of candidates to defendant Secretary of State on or before April 6, 1990 in order to have the names of its candidates placed on the November 1990 ballot.[3] The candidates of major parties would not be determined for at least two more months, the first party primaries being held in early June. However, April 6 is also the date that a candidate who wished to run for a Republican Party or Democratic Party nomination had to declare his or her candidacy. Ala.Code § 17–16–11(a). Independent candidates also have the same filing deadline. Ala.Code § 17–7–1(a)(3).[4]

Friedman's original goal was to gain access for NAP on the 1992 ballot.[5] Subse-

---

**2.** Although plaintiffs allege a violation of the Fifteenth Amendment, which reads: "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude", plaintiffs put on no evidence regarding this claim and the parties have made no arguments based on this amendment. Accordingly, the Court declines to consider the Fifteenth Amendment and the case law deriving therefrom in determining the merits of this case.

**3.** Ala.Code § 17–7–1 (1975) (as amended) states:

(a) The following persons shall be entitled to have their names printed on the appropriate ballot for the general election, provided they are otherwise qualified for the office they seek:

\* \* \* \* \* \*

(2) All candidates who have been put in nomination by any caucus, convention, mass meeting or other assembly of any political party or faction and certified in writing by the chairman and secretary of the nominating caucus, convention, mass meeting or assembly and filed with the probate judge, in the case of a candidate for county office, and the secretary of state in all other cases, on or before 5:00 P.M. 60 days before the date of the first primary election.

\* \* \* \* \* \*

Ala.Code § 17–8–2.1 (1975) (as amended) states:

(a) No political party, except those qualified as a political party under Title 17, chapter 16, shall be included on any general election ballot unless:

(1) The party shall have filed with the secretary of state or other appropriate official at the same time set by law in section 17–16–11, for candidates in primary elections to qualify a list of the signatures of at least one percent of the qualified electors who casts ballots for the office of the governor in the last general election for the state, county, city, district or other political subdivision in which the political party seeks to qualify candidates for office;

\* \* \* \* \* \*

Ala.Code § 17–16–11 states:

(a) All candidates for nomination to public office or for election to party office in the primary provided for in this chapter shall file their declaration of candidacy with the state party chairman if they seek any office other than a county office (including federal, state, circuit and district offices, the state senate and house of representatives), and with the county party chairman if they seek a county office, not later that 5:00 P.M. 60 days before the date of such primary.

\* \* \* \* \* \*

**4.** The filing deadlines for major party and independent candidates for the office of President differ in presidential election years. *See* note 5 and the text accompanying note 8, *infra*.

**5.** The election in 1992 will be a presidential election, the primaries for which are governed by Ala.Code §§ 17–16A–1 *et seq.* (formerly Ala.

quently, plaintiffs decided to try to gain access in 1990. Plaintiffs started to obtain signatures in May of 1990. Plaintiffs submitted an adequate number of signatures [6] to defendant on June 5, 1990, the date of the major parties' primaries. Defendant denied plaintiffs access to the November 1990 general election ballot solely because plaintiff NAP did not submit its signature petition for ballot access and the names of its nominated candidates by the designated deadline, that is, April 6, 1990 at 5:00 P.M.

The laws in question, that is, Ala.Code §§ 17–7–1 and 17–8–2.1, were passed in 1982 and were in effect for the election in 1984 and all elections thereafter. See Acts of Alabama 1982, No. 572 §§ 1, 2 and No. 611 § 1. In the 1984 election, there were various independent and minor party candidates on the ballot for national, state and local offices. For offices other than those of President and Vice President, the major parties held primaries in September of 1984; [7] therefore, minor party ballot petitions were due in July, Ala.Code § 17–8–2.1(b), although signature petitions for independent presidential nominations were not due until the last day of August. Ala.Code § 17–19–2(b).[8]

In 1986, three independent candidates were certified for various local offices around the state and a Socialist Workers Party candidate as certified for the Sixth Congressional District. The major parties' primaries were held in June of 1986,[9] and so signature petitions and certification of nominations of minor party candidates were due in April, as were signature petitions for independent candidates.

In 1988, there were three pairs of independent candidates [10] and a pair of Libertarian Party candidates for the offices of President and Vice President. Libertarians also ran in all seven of Alabama's Congressional Districts as well as for a statewide office and four local positions. Two independents ran for local positions. In all of these elections there were numerous write-in votes.[11] Since this was a presidential election year, independent presidential candidate petitions were not due until August, although all other signature petitions for both minor party and other independent candidates were due in April.

There are no minor party candidates on the 1990 general election ballot. There are two independent candidates who have been certified for the 1990 ballot.

Dr. Allen J. Lichtman, who is a professor of history at the American University in Washington D.C. and who is qualified as an expert in the area of minor party politics, testified that, according to his survey of

Code §§ 17–18A–1 et seq. (1975)). Major party presidential preference primaries have been conducted in March since 1980. Ala.Code § 17–16A–1; Acts of Alabama 1978, No. 691 § 1; Acts of Alabama 1979, No. 547 § 1.

6. The number of signatures needed to access the general election ballot for the County Commissioner seat sought by plaintiff Jeter was 311. The number of signatures needed for the Sixth United States Congressional District seat sought by plaintiff Ivory was 1,888. Plaintiffs could have qualified for any statewide office by obtaining 12,033 signatures.

7. Non-presidential primaries previously had been held in May, but the date was changed to September in 1978. See Acts of Alabama 1978, No. 691 § 16.

8. The number of signatures required for an independent presidential candidate in 1984 was 5000, see Ala.Code § 17–19–2(a). This is different from the number of signatures required for a non-presidential independent candidate, see Ala.Code § 17–7–1(a)(3) (one per cent of num-

ber of total voters in pertinent political division), and different from the number of signatures required for a minor party candidate for any office. See Ala.Code § 17–8–2.1(a)(1) (one per cent of number of voters who voted in past gubernatorial election from pertinent political division).

9. The date of the primaries changed in 1986 from September to June. See, Acts of Alabama 1985, No. 389. The date of the primaries has remained first Tuesday in June through the present date. See Ala.Code § 17–16–6 (1975) (as amended).

10. One of these pairs of candidates were Lenora Fulani and Joyce Dattner, who ran as New Alliance Party candidates in other states. Lenora Fulani is the founder and chairwoman of the national New Alliance Party. The Fulani–Dattner pair garnered 3,311 votes in Alabama.

11. Ala.Code §§ 17–8–5 and 17–8–20 govern the procedures for voting for a person whose name does not appear on the ballot.

election laws in the various states, Alabama has one of the earliest minor party signature petition filing deadlines nationally. He testified that a majority of states require minor parties to file such petitions in either August or September, and that a number of states do not require minor parties to file until after the major parties have conducted their primaries. He also testified that an earlier filing deadline places a significant burden on minor parties because voters tend to be disinterested any length of time before an election and because minor party organizers must spend much, if not all, of their time collecting signatures and cannot spend time on fund raising or on voter education. This testimony corroborated that of Friedman, who testified as to the difficulties he experienced in garnering support for NAP's effort to field candidates in the 1990 election. Dr. Lichtman acknowledged that Alabama's requirement as to the number of signatures a minor party must obtain are far less burdensome than the requirements of many states. He also acknowledged that Alabama does not place any restrictions on the time period for obtaining such signatures. However, he criticized the filing deadline and stated that, in his opinion, none of Alabama's stated interests [12] justified such an early deadline.

## STANDARD TO APPLY

The seminal case which established that challenges to restrictions on ballot access is proper grist for federal court mills is *Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968). In *Williams*, the Supreme Court considered a series of election laws of the State of Ohio which made it "virtually impossible for a new political party, even though it has hundreds of thousands of members, or an old party, which has a very small number of members, to be placed on a state ballot to choose electors pledged to particular candidates...." 393 U.S. at 24, 89 S.Ct. at 7. In finding such restrictions unconstitutional, the Supreme Court "reject[ed] the notion that Art. II, § 1, gives the States power to impose burdens on the right to vote, where such burdens are expressly prohibited in other constitutional provisions" and held that "no State can pass a law regulating elections that violates the Fourteenth Amendment's command that 'No State shall ... deny to any person ... the equal protection of the laws.'" 393 U.S. at 29, 89 S.Ct. at 10. In his concurring opinion, Mr. Justice Harlan wrote, "I would rest this decision entirely on the proposition that Ohio's statutory scheme violates the basic right of political association assured by the First Amendment which is protected against state infringement under the Due Process Clause of the Fourteenth Amendment." 393 U.S. at 41, 89 S.Ct. at 16 (citations omitted). Regardless of whether the analysis proceeded under the Equal Protection Clause or the Due Process Clause, the majority agreed that a state must have a compelling interest in the restrictions it imposes on ballot access in order for these restrictions to withstand constitutional scrutiny. Although the Supreme Court recognized that Ohio had an interest in encouraging political stability, in attempting to see that the election winner be the choice of a majority of its voters, and in providing the elector-

12. The parties stipulated that the State of Alabama does have certain interests in setting procedures for ballot access for minor parties. The State suggests that these interests include: To educate voters and to allow time for the electorate to evaluate all available information when selecting an office holder; to provide equal treatment for partisan and independent candidates; to prevent "sore losers" (candidates who lost in the primary) from running as independent candidates; to assure that a non-major party candidate is a serious contender who is truly independent and who has a satisfactory level of community support; to prevent the clogging of Alabama's election machinery, to avoid voter confusion and to assure that the winners are a choice of a majority of at least a strong plurality of those voting; to avoid run-off general elections and to avoid the possibility of unrestrained factionalism at the general election; to protect the integrity of Alabama's political process from frivolous candidacies to ensure fair and honest elections; to encourage compromise and political stability; to reserve the general election ballot for major struggles and to limit those on the ballot to candidates who have won the primaries and independents who have properly qualified; to avoid confusion, deception and even frustration of the democratic process at the general election.

ate with an understandable ballot, it found these interests insufficient to justify the degree of restrictions imposed by Ohio and stated that "the number of voters in favor of a party, along with other circumstances, is relevant in considering whether state laws violate the [Constitution]. And, as we have said, the State is left with broad powers to regulate voting, which may include laws relating to the qualification and functions of electors. But here the totality of the Ohio restrictive laws taken as a whole imposes a burden on voting and associational rights which we hold is ... [a] violation of the [Constitution]." 393 U.S. at 34, 89 S.Ct. at 12.

In the years following the decision in *Williams*, the Supreme Court has had various occasions to review ballot access restrictions. In *Jenness v. Fortson*, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971), the Supreme Court ruled that certain election laws [13] of the State of Georgia were constitutional. In upholding the laws, the Supreme Court noted that "... Georgia in no way freezes the status quo, but implicitly recognizes the potential fluidity of American political life", 403 U.S. at 439, 91 S.Ct. at 1975, and stated that "[t]he fact is that there are obvious differences in kind between the needs and potentials of a political party with historically established broad support, on the one hand, and a new or small political organization on the other." 403 U.S. at 441, 91 S.Ct. at 1976.

In *Storer v. Brown*, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974), the Supreme Court upheld a California law which barred a person who had been affiliated with a party within one year prior to a primary from seeking ballot access as an independent candidate. It held that a state has a compelling interest in the stability of its political system and that California's method of protecting that interest did not discriminate against independents. 415 U.S. at 733–735, 94 S.Ct. at 1280–1282. Perhaps more importantly, it reversed and remanded a portion of the district court's ruling as to whether the number of signatures an independent candidate had to gather in a 24–day period was unduly burdensome. The *Storer* Court instructed that the analysis which a trial court must perform in reviewing restrictions on ballot access is whether

> in the context of [a State's] politics, could a reasonably diligent independent candidate be expected to satisfy the signature requirements, or will it be only rarely that the unaffiliated candidate will succeed in getting on the ballot? Past experience will be a helpful, if·not always an unerring, guide: it will be one thing if independent candidates have qualified with some regularity and quite a different matter if they have not.

415 U.S. at 742, 94 S.Ct. at 1285. In *Mandel v. Bradley*, 432 U.S. 173, 97 S.Ct. 2238, 53 L.Ed.2d 199 (1977), the Supreme Court held that the test set out in *Storer* was to be applied to challenges to filing deadlines.[14]

In *Illinois Elections.Board v. Socialist Workers Party*, 440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979), the Supreme Court struck down certain Illinois statutes which required a greater number of signatures on nominating petitions submitted by minor party and independent candidates for mayoral elections in Chicago than were required for access to statewide elections. Although the Supreme Court acknowledged that Illinois had a legitimate interest in setting minimum signature require-

---

**13.** These laws required that nominating petitions for minor party and independent candidates be signed by 5% of those eligible to vote at the last election for the office a candidate was seeking and restricted the time period for gathering such signatures to 180 days prior to the deadline which a candidate filing in a party primary had to meet. 403 U.S. at 433–434, 91 S.Ct. at 1971–1972.

**14.** The plaintiff in *Bradley* challenged a Maryland statute which required an independent candidate to file a nominating petition signed by at least 3% of the State's registered voters and a certificate of candidacy 70 days before the date on which party primaries were held. The Supreme Court noted that in presidential election years this deadline was approximately 230–240 days before the election and in other years it occurred 120 days before the election. 432 U.S. at 174, 97 S.Ct. at 2239–40. The only requirement challenged in *Bradley* was the early filing deadline.

ments, it stated that " 'even when pursuing a legitimate interest, a State may not choose means that unnecessarily restrict constitutionally protected liberty,' " and that a State must "adopt the least drastic means to achieve [its] ends." 440 U.S. at 185, 99 S.Ct. at 991 (citations omitted). The Court reasoned that, since the State had determined that a smaller number of signatures adequately protected its interest with regard to statewide elections, there existed a less drastic means to protect the same interest for municipal elections.

In 1983, the Supreme Court struck down an Ohio statute which required an independent candidate for President to file a statement of candidacy and nominating petition in March in order to appear on the general election ballot in November. *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983). In so doing, the Court stated that

> a court must resolve ... a challenge [to ballot access restrictions] by an analytical process that parallels its work in ordinary litigation. It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

460 U.S. at 789, 103 S.Ct. at 1570. In determining the "character and magnitude of the asserted injury", the *Celebrezze*

Court considered the circumstances of other individuals who were able to qualify as independent candidates for President on the 1980 ballot. 460 U.S. at 791 n. 12, 103 S.Ct. at 1571 n. 12. Accordingly, *Celebrezze* does not require a different analysis than does *Storer*, but rather expands on the analysis which a trial court must undertake. This analysis consists of initially determining the difficulty posed by the challenged provision, in this case, the difficulty of meeting the early deadline, and then weighing the interests advanced by the State as justifications for any burden on those who seek ballot access against the burden involved. *Bergland v. Harris*, 767 F.2d 1551, 1554 (11th Cir.1985).[15]

## ANALYSIS

In the case at hand, it is obvious that the early deadline in question placed a burden on the plaintiffs, given that they were unable to meet the deadline imposed, but were able to meet the signature requirement at a later date. However, it is not so obvious the nature and extent of the burden imposed by the April filing requirement.

■ In the presentation and argument of this case, plaintiffs have focused in part on the fact that Alabama provides an elaborate system whereby major party candidates can contest primary election results and also provides for other contingencies which may result in the State withholding certification of a major party candidate until the eleventh hour.[16] Although this evidence tends to show that the State would be able to place the name of a candidate on the ballot at a fairly late date without unduly impairing the administrative task of printing the ballot, the Court does not find that Alabama's failure to provide similar contingency provisions for minor party candidates relevant to the case at hand. Indeed, it has been a constant theme in the

**15.** The Court finds that the case of *Munro v. Socialist Workers Party,* 479 U.S. 189, 107 S.Ct. 533, 93 L.Ed.2d 499 (1986) does not change this analysis since the Supreme Court found in that case that the Washington State law at issue did not impose a burden on minor party and independent candidates' access to the State's ballot. 479 U.S. at 199, 107 S.Ct. at 339–40.

**16.** Plaintiffs presented evidence indicating that certain Democratic candidates may not be certified until mid-October for the November 1990 election.

cases governing ballot access restrictions that a State need not, and indeed probably should not, treat minor parties and independents the same as major parties. *See Williams v. Rhodes, supra; Jenness v. Fortson,* 403 U.S. at 441–442, 91 S.Ct. at 1976; *American Party of Texas v. White,* 415 U.S. 767, 788, 94 S.Ct. 1296, 1309–10, 39 L.Ed.2d 744 (1974). Rather, a State need only provide reasonable access to minor parties and independents to the ballot. *Munro v. Socialist Workers Party,* 479 U.S. at 196, 107 S.Ct. at 537–38.

■ Plaintiffs have also focused on the fact that Alabama not only requires a minor party to submit a signature petition to qualify for ballot access by April 6, but also requires a minor party to nominate its candidates by the same date. *See* Ala.Code §§ 17–7–1(a)(2) and 17–8–2.1(a)(1). However, the testimony presented indicates that plaintiff NAP did not attempt to gather signatures to obtain ballot access until after it knew who its candidates were going to be.[17] Plaintiffs' witness Friedman testified that he had difficulty interesting persons to run as NAP candidates before NAP had a place on the ballot, but also that he had trouble interesting voters in signing petitions for NAP to obtain ballot space before it fielded a candidate. Although the Court recognizes that the simultaneous deadlines may pose a burden on a minor party in some instances,[18] the evidence submitted in this case does not establish that the concurrent deadlines posed any extra burden on these plaintiffs be-

yond the burden of meeting both by an early date.[19]

■ Defendant has provided evidence that, in prior elections governed by the statutes in question, other independent and minor party candidates have been able to obtain access to Alabama's ballot. The raw numbers provided defy easy analysis given the variation in deadlines imposed on independents, minor parties and major parties for presidential as opposed to non-presidential elections. Because presidential elections pose special circumstances for independent presidential candidates, the Court will not consider such candidates in its analysis of the accessibility to the Alabama ballot for minor party candidates. Also, the Court will not consider the number of minor party candidates running in 1984, as the deadline for filing was in July of that year rather than April.[20]

Given these exclusions, the evidence reveals that in 1986, three independent candidates qualified for various local offices and a minor party candidate qualified in a United States congressional district. In 1988, fourteen minor party candidates qualified for various national, state and local offices and two independents ran for local positions. In 1990, only two independent candidates are on the ballot. This evidence indicates that, although Alabama's early deadline does not serve to "freeze the status quo", *see Jenness v. Fortson, supra,* it does make it moderately difficult for a minor party candidate to qualify to be on

17. Friedman testified that he recruited plaintiffs Jeter and Ivory in May. The parties stipulated that the plaintiffs did not begin to gather signatures until May.

18. The Court takes judicial notice that the nomination of the Libertarian Party candidate for the office of President was contested for the 1988 election.

19. The parties did stipulate that plaintiff NAP certified its nominees after it submitted its signature petitions. However, there was no evidence introduced as to any difficulty the concurrence of the deadlines may have presented. Plaintiff NAP may easily have been able to meet these deadlines concurrently, although at a later date, given that plaintiff NAP only has approximately 55 members in Alabama.

Plaintiffs also submitted evidence that the concurrent deadlines imposed a burden because party affiliates had to spend a significant amount of time gathering signatures and could not spend time on fund raising, voter education and other party activities. However, the undisputed evidence shows that the plaintiffs began to gather signatures in May and had the requisite number of signatures by June 5. The Court finds that the time actually diverted to signature gathering was not substantially burdensome.

20. As it is undisputed that plaintiffs could have met a July deadline, the ability of candidates to qualify in 1984 is not helpful to the Court's analysis.

the ballot, especially in a non-presidential, election year.

Although the Court finds that the burden imposed on minor parties is not insurmountable, the Court determines that plaintiffs are due to be granted the relief requested because the interests put forth by the defendant do not adequately justify the restriction imposed. The Court recognizes that the State has a legitimate interest in regulating the procedures by which minor parties and independents gain access to the ballot. However, a State must "adopt the least drastic means to achieve [its] ends." *Illinois Elections Board v. Socialist Workers Party,* 440 U.S. at 185, 99 S.Ct. at 991 (citations omitted). The reason offered by the State as serving legitimate State interests in having minor parties qualify for ballot space and nominate their candidates at the same time that major party affiliates merely announce their candidacies for nomination are not persuasive.[21] Although the State has a valid and compelling interest in requiring a minor party to submit its qualifying petitions and nominate its candidates at a time substantially prior to the election, it appears that this process previously occurred in July. The State has put forward nothing which would indicate that this later deadline would undermine any of its stated interests in setting procedures for ballot access. No one can seriously contend that a deadline for filing for a minor party and its candidate seven months prior to the election is required to advance legitimate state interests. Accordingly, there appears to be a less drastic means for the State to achieve its ends.

## CONCLUSION

Although the Court finds that the deadlines in question do not freeze the political status quo and that they do not pose an insurmountable obstacle to ballot access for minor parties, the Court finds that they do pose a significant burden on plaintiffs in their attempts to access the Alabama ballot and do not serve any compelling state inter-

est. Having found such a burden, and also finding that the State could adopt less drastic deadlines which would serve its interests, the Court determines that the April 6 deadlines cannot pass constitutional muster in that they violate the First and Fourteenth Amendments to the United States Constitution. Therefore, plaintiffs are entitled to have such deadlines declared unconstitutional and to have defendant enjoined from enforcing these deadlines.

---

**21.** Alabama has a separate "sore loser" statute and so the interests in political stability which were significant in *Storer* are otherwise protected in this case.