**U.S. TAXPAYERS PARTY OF FLORIDA, Howard Phillips, A.W. Knight, Jr., Robert G. "Bud" Feather, Al Clark, and Ron Cole, Plaintiffs,**

v.

**Jim SMITH, in his official capacity as Secretary of State of the State of Florida, Defendant.**

No. 92–CV–40253.

United States District Court,
N.D. Florida,
Tallahassee Division.

June 14, 1993.

Jerry G. Traynham, Patterson & Traynham, Tallahassee, FL, Gary Sinawski, Gary Sinawski, P.A., New York City, for plaintiffs.

George L. Waas, Atty. General's Office, Dept. of Legal Affairs, Tallahassee, FL, for defendant.

STAFFORD, District Judge.

Before the court are the parties' cross-motions for summary judgment (documents 5 and 17) and the responses thereto (documents 7 and 19). On August 28, 1992, this court denied plaintiffs' motion for a preliminary injunction (document 11). On December 8, 1992, in response to a court order dated November 24, 1992, plaintiffs notified this court of their intention to pursue this case. *See* document 16. The court notified the parties that their cross-motions for summary judgment would be taken under advisement, and invited them to submit all materials in support of or in opposition to their respective motions. *See* document 15 at 2. For the following reasons, the court determines that plaintiffs' motion for summary judgment should be denied and that defendant's motion for summary judgment should be granted.

I. *Facts*

The plaintiffs in this action are the U.S. Taxpayers Party of Florida[1], a minor politi-

---

1. a/k/a United States Taxpayers Party of Florida. *See* document 24 at 4.

cal party; three candidates—Howard Phillips and A.W. Knight, Jr. for President and Vice President of the United States, respectively and Robert G. "Bud" Feather for representative to Congress from the seventh congressional district—whom the Taxpayers Party seeks to have placed on the ballot for the November 3, 1992 general election; and representative voters—Feather, Al Clark and Ron Cole—who desire to support and vote for the Taxpayers Party and its candidates in Florida. The defendant is the chief election officer of Florida.

Plaintiff Taxpayers Party is a new political party formed on or about March 12, 1992 when it became a "minor political party" upon satisfying the conditions found in Fla. Stat.Ann. § 97.021(15). Early in May 1992, the Party began collecting petition signatures for plaintiff-candidates Phillips and Knight pursuant to Fla.Stat.Ann. § 103.021(3) which provides that a minor political party must nominate its candidate for president and vice president by means of a petition signed by one percent of the registered electors of Florida and filed no later than July 15.[2] In order to ensure collection of the required 60,312 valid signatures, plaintiffs estimated that they would have to collect approximately 85,000 signatures. By July 14, the day before the filing deadline, plaintiffs had collected approximately 51,000 signatures and had filed approximately 40,000 of those signatures with the county supervisors of elections.

On or about July 9, 1992, the Party decided to run plaintiff Feather in the new seventh congressional district and began collecting petition signatures for him pursuant to Fla.Stat.Ann. §§ 99.09651 and 99.061 which require a minor party candidate for congress, such as plaintiff Feather, to file 5,625 petition signatures by July 6.[3] According to plaintiffs, "the Taxpayers Party was unable even to make a decision about whether to run him for congress or in which district to do so until after July 1, because the new congressional district lines in Florida were not established until then."[4] Document 7 at 5.

In a hand-delivered letter to defendant Smith dated July 9, 1992, the Taxpayers Party requested that the July 15 filing deadline for presidential and vice presidential candidates be extended to August 15. Exhibit A to document 6. The state denied the request stating that

> The Department of State has no authority to waive this deadline or establish a different deadline. This requirement is imposed

2. Section 103.021(3) provides, in pertinent part:

 A minor political party may have the names of its candidates for President and Vice President printed, and independent candidates for President and Vice President may have their names printed, on the general election ballots if a petition is signed by 1 percent of the registered electors of Florida, as shown by the compilation by the Department of State for the last preceding general election. A separate petition from each county for which signatures are solicited shall be submitted to the supervisor of elections of the respective county no later than July 15 of each presidential election year. The supervisor shall check the names and, on or before the date of the first primary, shall certify the number shown as registered electors of the county.

3. Plaintiffs state that the deadline is July 6, 1992, the 57th day before the first primary (document 2 at 8). Fla.Stat. § 99.061(8) provides that

 Notwithstanding the qualifying period prescribed by this section, in each year in which the legislature apportions the state, the qualifying period for persons seeking to qualify for nomination or election to federal office shall be between noon of the 57th day prior to the first primary, but not later than noon of the 53rd day prior to the first primary.

 It therefore appears that the deadline is noon on the 53rd day prior to the first primary. The first primary is September 1, 1992; 53 days prior to that date is July 10, 1992. The court notes, however, that its decision would be the same regardless of whether the deadline were July 6 or July 10.

4. According to plaintiffs, the congressional lines were not in place until July 1, 1992. Plaintiffs are mistaken. The proceedings in *De Grandy v. Wetherell*, 794 F.Supp. 1076 (1992) were bifurcated into congressional reapportionment and legislative reapportionment. While the 1992 *state* House and Senate district boundaries were not conclusively established by the court until July 2, 1992, the 1992 *congressional* district boundaries were adopted by this court on May 29, 1992. *See* documents 438 and 439, *De Grandy v. Wetherell*, 794 F.Supp. 1076 (1992).

by law and would require action by the legislature to be changed.

Exhibit B to document 6. In another letter to defendant Smith dated July 10, the Party requested that the filing deadline for minor party congressional representatives be extended to September. Exhibit C to document 6; document 7 at 5. This request was similarly denied by letter dated July 14, 1992.

On July 15, 1992, plaintiffs filed this suit seeking declaratory and injunctive relief from Fla.Stat.Ann. §§ 103.021(3) and 99.061.[5] Plaintiffs contend that these requirements "abridge their First and Fourteenth Amendment speech, voting and associational rights, and unconstitutionally discriminate against them on the basis of their political beliefs and affiliations." Document 1 at ¶ 4. Specifically, plaintiffs argue that while the Democratic party did not nominate its presidential/vice presidential candidates until on or about July 19, 1992 and the Republican Party did not nominate its executive candidates until on or about August 19, 1992, the Taxpayers Party is forced to nominate its candidate by July 15, 1992. Plaintiffs also contend that Florida's July 15 petition filing deadline for nonmajor party candidates for president and vice president is the sixth-earliest in the country. Furthermore, plaintiffs also note that Florida itself had an August 15 deadline for over thirty years—from 1949 to 1983—and has made the process of certifying petition signatures faster now than it was during the previous thirty years by computerizing its voter registration system. Finally, plaintiffs note that Florida's requirement of substantially more petition signatures of nonmajor party candidates than any other state except California places an additional burden upon them.[6] As to the congressional deadlines, plaintiffs argue additionally that the major parties will not nominate their congressional candidates for the general election until the primary elections scheduled for September 1 and September 29.

Defendants argue that because the state's choices of the petition filing cutoff date for minor political party presidential, vice presidential, and congressional candidates provide for reasonable ballot access, they should be upheld.

## II. *Analysis*

### A. *The Appropriate Standard of Review—The* Anderson *Test*

 The court must first determine the applicable constitutional standard of review. Plaintiffs contend that the challenged law infringes their fundamental First and Fourteenth Amendment rights. "Restrictions on access to the ballot burden [the] fundamental ... 'right of individuals to associate for the advancement of political beliefs' ..." *Illinois State Board of Elections v. Socialist Workers Party,* 440 U.S. 173, 184, 99 S.Ct. 983, 990, 59 L.Ed.2d 230 (1979) (quoting *Williams v. Rhodes,* 393 U.S. 23, 30, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968)). Ordinarily, the strict scrutiny test applies to classifications affecting the exercise of fundamental rights. *Fulani v. Krivanek,* 973 F.2d 1539, 1542 (11th Cir.1992); *see also Duke v. Cleland,* 954 F.2d 1526, 1529 (11th Cir.1992) ("[i]f the challenged law burdens a fundamental constitutional right, then the law can survive only if the State demonstrates that the law advances a compelling interest and is narrowly tailored to meet that interest"); *Eu v. San Francisco County Democratic Cent. Comm.,* 489 U.S. 214, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989). "Under strict scrutiny analysis, once a plaintiff has demonstrated the burden on her fundamental right, the state must show 'that the law advances a compelling interest and is narrowly tailored to meet that interest.'" *Fulani,* 973 F.2d at 1542–43 (quoting *Cleland,* 954 F.2d at 1529).

---

**5.** In response to this court's order dated May 5, 1993, plaintiffs amended their complaint solely to confirm that the "United States Taxpayers Party of Florida" and the "U.S. Taxpayers Party of Florida" are one and the same. Accordingly, all references in this order are to plaintiffs' original complaint.

**6.** The three states that require the most signatures are California—134,781; Florida—60,312; and North Carolina—43,601. Declaration of Richard Winger at ¶ 5.

In ballot access cases, however, the Supreme Court has often deviated from the strict scrutiny model of analysis. *Fulani*, 973 F.2d at 1543; *Duke*, 954 F.2d at 1529. When addressing a First Amendment challenge to a state election law, instead of applying strict scrutiny, a court

> must resolve [a constitutional] challenge by an analytical process that parallels its work in ordinary litigation. It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendment that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

*Anderson v. Celebrezze*, 460 U.S. 780, 789, 103 S.Ct. 1564, 1570, 75 L.Ed.2d 547 (1983); *see also Fulani*, 973 F.2d at 1543. The Court acknowledged that this weighing would not produce automatic results and that hard judgments often must be made. *Id.* at 790, 103 S.Ct. at 1570; *see also Duke*, 954 F.2d at 1530.

In *Norman v. Reed*, 502 U.S. 279, 112 S.Ct. 698, 116 L.Ed.2d 711 (1992), the Court seemed to retreat from the *Anderson* analysis and return to the traditional strict scrutiny analysis in ballot access cases. In *Duke v. Cleland*, the Eleventh Circuit specifically refrained from deciding on the proper standard of scrutiny. Rather, the majority assumed *arguendo* that the strict scrutiny standard applied, but concluded that the interests advocated by the state were compelling and justified the resulting burden. *Duke*, 954 F.2d at 1530. Because it found that appellants were unlikely to prevail on the merits, it affirmed the district court's denial of a preliminary injunction. *Id.* Although the *Duke* majority declined to decide upon the

appropriate level of scrutiny, Judge Kravitch, after noting that the Supreme Court occasionally deviated from the strict scrutiny standard,[7] nonetheless concluded that strict scrutiny "remains the traditional method by which alleged state deprivations of First Amendment rights are reviewed." *Duke*, 954 F.2d at 1534 (Kravitch, J., dissenting).

In *Burdick v. Takushi*, 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992), the Court reconciled any perceived confusion between its ruling in *Anderson* and *Reed*. It reaffirmed the states' rights to regulate elections, including the constitutional right bestowed on the states to prescribe "[t]he Times, Places and Manner of holding Elections for Senators and Representatives." *Burdick*, 504 U.S. at ——, 112 S.Ct. at 2063 (quoting U.S. Const. Art. I, § 4, cl. 1). It also found that subjecting every voting regulation to strict scrutiny and thereby requiring that the regulation be "narrowly tailored to advance a compelling state interest ... would tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Burdick*, 504 U.S. at ——, 112 S.Ct. at 2063. Accordingly, it reaffirmed the flexible standard adopted in *Anderson* that

> A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justification for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights.

*Burdick*, 504 U.S. at ——, 112 S.Ct. at 2063 (citing *Anderson*, 460 U.S. at 788–89, 103 S.Ct. at 1569–70). The Eleventh Circuit has characterized this approach as "a balancing test that ranges from strict scrutiny to a rational-basis analysis, depending on the circumstances." *Fulani*, 973 F.2d at 1543. In *Fulani v. Krivanek*, 973 F.2d 1539 (11th Cir.1992), the Eleventh Circuit held that in this circuit, constitutional challenges to state ballot access laws—whether based on the

7. In *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), for example.

equal protection clause or the First Amendment—are to be considered under the "less rigorous" *Anderson* test rather than under the strict scrutiny test.[8] Succinctly stated, that test requires this court to initially determine the difficulty posed by the challenged provision—in this case, the difficulty of meeting the early deadline—and then weighing the interests advanced by the state as justifications for any burden on those who seek ballot access against the burden involved. *New Alliance Party v. Hand,* 933 F.2d 1568, 1574 (11th Cir.1991) (citing *Bergland v. Harris,* 767 F.2d 1551, 1554 (11th Cir.1985)). It is under this test, therefore, that the Florida statutes must be analyzed.

### 1. Character and Magnitude of the Asserted Injury

Courts are required to "first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." *Anderson,* 460 U.S. at 789, 103 S.Ct. at 1570; *Fulani,* 973 F.2d at 1544. In making this determination, this court should consider the circumstances of other individuals who were able to qualify as minor party candidates under the challenged statute. *Hand,* 933 F.2d at 1574 (citing *Anderson,* 460 U.S. at 791 n. 12, 103 S.Ct. at 1572 n. 12).

■ The facts in this case are similar to those in both *Anderson* and *Hand.* In *Anderson,* plaintiffs challenged Ohio's statute requiring independent candidates for the office of President to file a statement of candidacy and nominating petition in March in order to appear on the general election ballot in November. Noting that "Ohio's filing deadline prevents persons who wish to be independent candidates from entering the significant political arena established in the State by a Presidential election campaign— and creating new political coalitions of Ohio voters—at any time after mid to late March," the Court held that the early filing deadline

placed an unconstitutional burden on the voting and associational rights of petitioner Anderson's supporters. *Anderson,* 460 U.S. at 790, 103 S.Ct. at 1570. The *Anderson* court further characterized this burden as "severe" and subjected the regulation to strict scrutiny. As to the severity of the burden, the Court stated that "[t]he right to vote is 'heavily burdened' if that vote may be cast only for major-party candidates at a time when other parties or other candidates are 'clamoring for a place on the ballot.'" *Celebrezze,* 460 U.S. at 787, 103 S.Ct. at 1569 (quoting *Lubin v. Panish,* 415 U.S. 709, 716, 94 S.Ct. 1315, 1320, 39 L.Ed.2d 702 (1974)).

The challenged statute in *Hand* required a party seeking to have itself and its candidate placed on the ballot for the November 1990 general election to submit signature petitions and certification of its nomination of candidates to the Secretary of State on or before April 6, 1990. Plaintiffs began obtaining signatures in May 1990 and submitted the required signatures to the Secretary of State on June 5, 1990. The Secretary denied plaintiffs access to the November 1990 general election ballot solely because plaintiffs did not submit their signature petitions by the designated deadline—April 9, 1990. The Eleventh Circuit found that "the early deadline in question placed a burden on the plaintiffs, given that they were unable to meet the deadline imposed but were able to meet the signature requirements at a later date." *Hand,* 933 F.2d at 1574. As to the nature and extent of the burden imposed, the court noted that "in prior elections governed by the statutes in question, other independent and minor party candidates have been able to obtain access to Alabama's ballot." *Hand,* 933 F.2d at 1575. Specifically,

> [I]n 1986, three independent candidates qualified for various local offices and a minor party candidate qualified in a United States congressional district. In 1988, fourteen minor party candidates qualified for various national, state and local offices

---

8. In *Cleland,* the Eleventh Circuit did not decide upon the proper standard to apply in ballot access cases. Although plaintiffs in *Fulani* argued that the statute in question violated their equal protection rights (instead of their first amendment right of association), the holding in *Fula-*

*ni*—that ballot access cases should be analyzed under the *Anderson* test—also applies in cases where a plaintiff asserts a violation of his first and fourteenth amendment cases. *See Fulani,* 973 F.2d at 1543.

and two independents ran for local positions. In 1990, only two independent candidates are on the ballot.

*Hand,* 933 F.2d at 1575. Accordingly, the court found that "although Alabama's early deadline does not serve to 'freeze the status quo,' [citation] it does make it moderately difficult for a minor party candidate to qualify to be on the ballot, especially in a nonpresidential election year." *Hand,* 933 F.2d at 1575–76 (citing *Jenness v. Fortson,* 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971)). The Eleventh Circuit appeared to analyze the statute under the strict scrutiny standard.[9]

The July 6 congressional and July 15 presidential deadlines must be considered in conjunction with the ballot access regulations as a whole. As previously noted, Florida requires 60,312 signatures for presidential candidates (more than any other state except California) and 5,625 signatures for congressional candidates. Plaintiffs argue that these restrictions, taken together with the July 6 and 15 filing deadlines, unconstitutionally burden their First and Fourteenth Amendment rights. As to the July 15 presidential deadline, plaintiffs also argue that the restriction unconstitutionally "places a significant state-imposed restriction on a nationwide electoral process." *Celebrezze,* 460 U.S. at 795, 103 S.Ct. at 1573.

The Supreme Court has previously upheld party and candidate petition signature requirements that were as burdensome or more burdensome than Florida's one percent requirement. *Burdick,* 504 U.S. at —— n. 3, 112 S.Ct. at 2064 n. 3; *see e.g., Norman v. Reed,* 502 U.S. 279, 112 S.Ct. 698, 116 L.Ed.2d 711 (1992). As to the congressional deadline, the court notes that in a reapportionment year such as this one, Florida does not require that the petition signatures come from the specific district in which the candidate seeks to run. Rather, Fla.Stat. § 99.09651(3) provides that in a reapportion-

ment year, the required 5,625 petition "[s]ignatures may be obtained from *any* registered voter in Florida *regardless of* party affiliation or *district boundaries."* (Emphasis added). For the following reasons, this court finds that both the July 6 congressional deadline and the July 15 presidential deadline, considered in conjunction with the applicable qualifying statutes as a whole, do not severely burden either the voters' or the candidates' First or Fourteenth Amendment rights.

At the outset, it must be understood that any choice of filing deadlines is "necessarily arbitrary." *See Libertarian Party of Florida v. Florida,* 710 F.2d 790, 793 (11th Cir. 1983). Once a filing deadline is established, "it would probably be impossible to defend it as either compelled or least drastic." *Id.* Any filing deadline, like any percentage or other numerical requirement, could be challenged *ad infinitum,* the challenging party contending that allowing candidates to file a few days later would not leave the state's interest unprotected. *Id.* Recognizing these possibilities, the Eleventh Circuit has devised a formula to avoid this type of litigious impasse:

> [A] court must determine whether the challenged laws "freeze" the status quo by effectively barring all candidates other than those of the major parties, [citation omitted] and provide a realistic means of ballot access. [Citation omitted]. The focal point of this inquiry is whether a "reasonably diligent ☐ candidate [can] be expected to satisfy the signature requirements." *Storer v. Brown,* 415 U.S. [724,] 742 [94 S.Ct. 1274, 1285, 39 L.Ed.2d 714] [ (1974) ]. Thus, the test is whether the legislative requirement is a rational way to meet this compelling state interest. The least drastic means test becomes one of reasonableness, i.e., whether the statute unreasonably encroaches on ballot access.

*Libertarian Party,* 710 F.2d at 793.

The court finds that neither of the challenged statutes runs afoul of this standard.

---

9. For example, the opinion stated that "a State must 'adopt the least drastic means to achieve [its] ends.'" *Hand,* 933 F.2d at 1576 (quoting *Illinois Elections Board,* 440 U.S. at 185, 99 S.Ct. at 991). The court also indicated that the state had a "valid and compelling interest" in requiring minor parties to submit its petitions early.

*Hand,* 933 F.2d at 1576. The terms "least drastic means," "compelling interest," taken together with the court's conclusion that "there appears to be a less drastic means for the State to achieve its end" implies that the court applied the strict scrutiny test to the statute in question.

Plaintiffs formed their party on March 12, 1992. Nothing prevented them from immediately starting to collect the 60,312 signatures required before their party's presidential candidate could be placed on the ballot. Nonetheless, plaintiffs chose to wait until May to begin collecting these signatures. By July 14, approximately two months after beginning their petition solicitation (but four months after they *could* have begun), plaintiffs had collected nearly two-thirds of the required signatures.[10] According to plaintiffs, had they had an additional thirty days—until August 15—they would have been able to collect *all* of the required signatures. Declaration of Al Clark at ¶ 6. Logically, then, had plaintiffs started collecting signatures thirty days earlier—in early April instead of early May—they would have been well able to meet the July 15 deadline. The court finds that a reasonably diligent minor party—even one who waited until early March in an election year to form a political party—could have gathered the required number of signatures by July 15, thereby ensuring its presidential and vice presidential candidates' place on the November ballot.

Likewise, there is no reason why plaintiffs could not have immediately started gathering the 5,625 petition signatures required to place congressional candidate Feather on the November ballot. Plaintiffs argue that because the congressional district lines in Florida were not established until July 1, they could not decide on the feasibility of a congressional run in a particular district until then.[11] Plaintiffs' argument is unconvincing. First of all, the congressional districts were established by this court on May 29, 1992 and not on July 1, 1992 as plaintiff claims. *See, supra*, note 4. Furthermore, as previously observed, there is no requirement in the state of Florida that the petition signatures come from the specific district in which the candidate seeks to run. At the very least, plaintiffs had from May 29 until July 6 to gather the 5,625 signatures required to place candidate Feather on the November ballot. These signatures could have been obtained from any of the over six million registered voters in the state of Florida and nothing prevented plaintiffs from beginning even earlier. Furthermore, plaintiffs admit that they could have collected and filed all necessary signatures in less than two months.[12] Had they started in May, they would have had no problem meeting the statutory filing deadline. Although the congressional districts may have been uncertain prior to May 29, a reasonably diligent candidate would have taken advantage of Florida's special reapportionment year statute enabling a candidate to collect the required signatures from *any* Florida registered voter, regardless of congressional district.

Florida's filing deadline prevents minor party Presidential and congressional candidates from entering the political arena at any time after July 15 or 6 respectively. The burden of the July filing deadlines in this case, however, is not as "severe" as the burden of the mid-March filing deadline found in *Celebrezze* or the April 6 deadline found in *Hand*. In both *Celebrezze* and *Hand*, the court found that the early deadlines both excluded independent and minor political party candidates who decide to run for office after the early deadline as well as burden the signature-gathering efforts of these potential candidates because voters tend to be disinterested and campaigns much more difficult to launch that far in advance of a general election. *See Celebrezze*, 460 U.S. at 792, 103

---

**10.** Plaintiffs estimated that they would have to collect approximately 85,000 signatures in order to ensure that the petition contained 60,312 valid signatures or registered electors. Declaration of Al Clark at ¶ 5. By July 14, they had already collected 51,000 of these signatures.

**11.** Mr. Feather is a former Republican Party leader in the Orlando area. The Taxpayers Party was interested in running him for congress in a district in which he would have a strong base of support. However, it did not want to run him against an entrenched incumbent. Based on

these considerations, the Taxpayers Party needed to know what the new districts were and which incumbents were likely to run in which new districts, in order to make an intelligent decision about Mr. Feather's candidacy. Clark Decl. at ¶ 7.

**12.** On July 9, 1992, plaintiffs began collecting signatures to place plaintiff Feather on the November ballot. Plaintiffs are confident that they could collect all of the required signatures by September 1. Clark Decl. at ¶ 8.

S.Ct. at 1572; *Hand,* 933 F.2d at 1572. Furthermore, the *Celebrezze* court dealt solely with a *presidential* election and noted that "in the context of a Presidential election, state-imposed restrictions implicate a uniquely important national interest." *Celebrezze,* 460 U.S. at 794, 103 S.Ct. at 1573.

In *Cromer v. South Carolina,* 917 F.2d 819 (4th Cir.1990), a requirement that an independent candidate for the State House of Representatives declare his candidacy approximately 70 days before the party primaries and approximately 200 days before the general election was held to have imposed an unconstitutional burden on the rights of those candidates and their supporters. Likewise, the court in *Cripps v. Seneca County Bd. of Elections,* 629 F.Supp. 1335 (N.D.Ohio 1985), struck down a statute requiring independent candidates to file nominating petitions 257 days before the general election.

In *Jenness v. Fortson,* 403 U.S. 431, 433, 438, 91 S.Ct. 1970, 1971, 1974, 29 L.Ed.2d 554 (1971) the Supreme Court held that Georgia's filing deadline of "the second Wednesday in June" for independent candidates was not "unreasonably early" and, therefore, not unconstitutional. Relying on *Jenness,* the Tenth Circuit, in *Rainbow Coalition v. Oklahoma State Election Board,* 844 F.2d 740 (10th Cir.1988) upheld a May 31 deadline for filing petitions for non-Presidential candidates. Although the panel agreed with the district court's observation that the May 31 deadline is "troublesomely early", rec., vol. I, doc. 51, at 11, they nonetheless "conclude[d] that under Supreme Court authority, Oklahoma's May 31 filing deadline is not unconstitutional, even in conjunction with the relatively high [five percent] signature requirement." *Rainbow Coalition,* 844 F.2d at 747.

A review of prevailing case law indicates that (1) a February filing deadline is too early (*Williams v. Rhodes, supra*), (2) a March filing deadline is too early (*Anderson v. Celebrezze, supra*), (3) a filing deadline of 75 days before the primary election (and 257 days before the general election) is too early (*Cripps v. Seneca County Board of Elections, supra*), (4) an April 6 filing deadline is too early (*New Alliance Party of Alabama v.*

*Hand, supra*) and (5) a May 31 filing deadline, although "troublesomely early," is constitutional. *See Libertarian Party of Kentucky v. Ehrler,* 776 F.Supp. 1200 (E.D.Ky. 1991). Furthermore, the holding in *Stevenson v. State Board of Elections,* 638 F.Supp. 547 (N.D.Ill.1986, *aff'd* 794 F.2d 1176 (7th Cir.1986), indicates that under extremely limited circumstances, even a filing deadline 323 days before the general election is constitutional.

Plaintiffs' arguments fail to convince this court that either Florida's presidential or congressional deadlines are unconstitutional. Plaintiffs argue that because the July deadlines precede the September primaries by such a long period of time and because the major parties do not nominate their candidates until their respective conventions in late July and early August, there is no need for such an early deadline. In *Cromer,* however, the court noted that "[t]he critical constitutional flaw in [an early] deadline lies not in the fact that it precedes party primaries, but in the sheer length of time by which it precedes the general election. This is the principal point in *Anderson*" *Cromer,* 917 F.2d at 825 n. 4. Florida's requirement that presidential signature petitions be filed on July 15—approximately 110 days before the general election and 48 days before the first primary—more nearly approximates the 75-day deadline previously sanctioned by the Supreme Court in *Celebrezze* and the 90-day window alluded to in *Cromer* than the March or April deadlines held unconstitutional in *Celebrezze* and *Cromer. See infra* at 435–436. A July 15 deadline, unlike the March 20 deadline in *Celebrezze,* does not place a "significant state-imposed restriction on a nationwide electoral process." *Celebrezze,* 460 U.S. at 795, 103 S.Ct. at 1573.

This court finds that Florida's requirement that congressional signature petitions be filed by July 6 [13]—approximately 120 days before the general election—is constitutional in light of the courts' decisions in *Jenness, Rainbow Coalition, Cromer,* and *Cripps,* as well as under the balancing test set forth in *Celebrezze.* Plaintiffs have not shown that it is

13. *See supra,* note 2.

likely that the "challenged laws 'freeze' the status quo by effectively barring all candidates other than those of the major parties." *Jenness,* 403 U.S. at 439, 91 S.Ct. at 1974.

### 2. *The Precise Interests Put Forward by the State*

■ The second step is to "'identify and evaluate the precise interest put forward by the State as justification for the burden imposed by its rule,' determining 'the legitimacy and strength of each of those interests.'" *Fulani,* 973 F.2d at 1546 (quoting *Anderson,* 460 U.S. at 789, 103 S.Ct. at 1570). In both *Hand* and *Fulani,* the Eleventh Circuit emphasized the court's role in ascertaining that the interests put forth by the state justify the discriminatory classification imposed by the rule. *Fulani,* 973 F.2d at 1546. In *Hand,* the court found that although the burden imposed on minor parties was not insurmountable, the interests put forth by the state were inadequate to justify the restriction imposed. Accordingly, the court found the *Hand* April 6 deadline to be unconstitutionally early. Similarly, in *Fulani,* the court found that "the state has failed to assert an interest to which the discriminatory classification contained in the fee-waiver provision is necessary, or even especially relevant." *Fulani,* 973 F.2d at 1544.

In *Fulani,* plaintiffs challenged a provision of the Florida election statute which denied minor party candidates who were qualifying by petition the option of waiving the signature verification fee. To gain access to the ballot, Florida required minor party candidates to submit petitions containing the signatures of at least one percent of the registered voters in the state. The signatures were verified by the supervisors of elections who, pursuant to Section 99.097(4), Florida

Statutes, charged the minor party candidates "the sum of 10 cents for each signature checked or the actual cost of checking signatures, whichever is less." Fla.Stat. § 99.097. Section 99.097(4) provided that the supervisor shall waive the signature verification fee for candidates who "cannot pay charges without imposing an undue burden on personal resources." *See Fulani,* 973 F.2d at 1540. The statute, however, specifically exempted minor party candidates from the waiver provision:

> However, an oath in lieu of payment of the charges shall not be allowed to verify the signatures on a petition to obtain ballot position for a minor party.

Fla.Stat. § 99.097(4).

In both *Hand* and *Fulani,* the court acknowledged that the state has an interest in setting procedures for ballot access for minor parties. *See Hand,* 933 F.2d at 1572 n. 12; *Fulani,* 973 F.2d at 1546.[14] In both cases, however, the court found the statutes unconstitutional. In *Hand,* the court stated that

> [a]lthough the State has a valid and compelling interest in requiring a minor party to submit its qualifying petitions and nominate its candidates at a time substantially prior to the election, it appears that this process previously occurred in July.[15] *The state has put forward nothing which would indicate that this later deadline would undermine any of its stated interests in setting procedures for ballot access.*

*Hand,* 933 F.2d at 1576. Because the court concluded that a filing deadline seven months prior to the election is not required to advance legitimate state interests, it found that the state could achieve its ends through less drastic means. *Hand,* 933 F.2d at 1576. Similarly, in *Fulani,* the court found that "[although t]he state identifies interests that

---

**14.** In *Fulani,* these interests included (1) regulating the election process, (2) avoiding voter confusion by ensuring that a party has a significant modicum of support before its name appears on the ballot and (3) ensuring that a party has a statewide, ongoing political organization with distinctive political character. *Fulani,* 973 F.2d at 1546. In *Hand,* the state set forth similar, but a more exhaustive list of interests including (1) educating voters and allowing time for the electorate to evaluate all available information when selecting an office holder, (2) assuring that

a non-major party candidate is a serious contender who is truly independent and who has a satisfactory level of community support, (3) preventing the clogging of Alabama's election machinery, and (4) to reserve the general election ballot for major struggles. *Hand,* 933 F.2d at 1572 n. 12. An exhaustive list of the state's interests are found at 933 F.2d at 1572 n. 12.

**15.** The State of Alabama changed its deadline from July to April.

courts have found compelling in other cases, [it] fails to explain the relationship between these interests and the classification in question." *Fulani*, 973 F.2d at 1544. In other words, "[t]he problem is that the state has plucked these interests from other cases without attempting to explain how they justify the discriminatory classification [permitting all but minor party candidates to waive the fee] here at issue." *Fulani*, 973 F.2d at 1546.

These two cases make it clear that a court must carefully scrutinize the interests asserted by the state and ascertain that the interests asserted justify the statute at issue. In support of its decision to establish a July deadline, Florida cites its need to "print, prepare, and handle the several ballots in Florida's 67 counties in accordance with Chapter 101, Fla.Stat., and the obligations imposed on supervisors of elections regarding absentee voters under § 97.063, Fla.Stat., and overseas voters under §§ 97.0631 and .064, Fla.Stat." Document 5 at 9. Specifically, the Director of the State of Florida Division of Elections, affies that:

> During presidential election years, supervisors of elections must ... discharge their many duties and responsibilities in connection with congressional, state and local elections. These obligations include the need to print and prepare ballots, as well as handle public access to the ballots, all in strict accordance with Chapter 101, Fla. Stat. Supervisors of elections must assure full compliance with obligations imposed on them regarding absentee voters under sections 97.063, Fla.Stat., and overseas voter under Sections 97.0631, 97.064 and 101.62, Fla.Stat.

Affidavit of Dorothy W. Joyce, exhibit to document 21 at ¶ 8. Additional specific reasons for the July 15 cutoff date are found in subsections (3) and (4) of § 103.021, recognizing the need to verify and certify the names, and notify the Department of State by September 1. *See* document 5 at 9. The Joyce affidavit further states that

> If supervisors of elections had to perform the[ir] duties in too restricted a timeframe, their ability to timely and efficiently meet all of their lawful obligations would be jeopardized to the detriment of the rights of the voters to have an orderly election process and to have their votes counted properly, as well as the candidates in having their names properly placed on the ballot.

Joyce aff. at ¶ 13.

Other courts have found these interests to be valid. In *Cromer v. South Carolina*, 917 F.2d 819, 825 (4th Cir.1990), the court found:

> The most obvious state interest justifying any pre-election filing deadline is the need to provide a decent interval for administrative processing and for voter education. While no constitutional maximum or minimum has been developed, most states seem to have fixed on 75 to 90 days as a reasonable period to accommodate these two undoubted state interests, both as relates to primary and general elections. Looking only to those interests, a state surely could require independent candidates to declare and perfect their candidacies 60 to 90 days before a general election.

*See also Rainbow Coalition*, 844 F.2d at 745–46.

### 3. *Necessity of the Provision to Advancing the State's Interests*

█ Finally, we "must consider the extent to which th[e state's] interests make it necessary to burden the plaintiff's rights." *Fulani*, 973 F.2d at 1546–47 (quoting *Anderson*, 460 U.S. at 789, 103 S.Ct. at 1570). In *Celebrezze*, the Court noted that Ohio did not suggest that the March deadline was necessary to allow petition signatures to be counted and verified or to permit November general election ballots to be printed. *Celebrezze*, 460 U.S. at 800, 103 S.Ct. at 1576. In fact, the Court recognized that the county boards of election did not begin to verify the signatures until the period July 1 to July 15 and that the Secretary of State did not certify the names of Presidential candidates for inclusion on the ballot until late August, after the party nominating convention. *Id.* at 800 n. 28, 103 S.Ct. at 1576 n. 28. Finally, it noted that based on the facts stipulated to in the district court, "no more than 75 days are necessary to perform these [above] tasks."

The 75–day period found reasonable in *Celebrezze* is based on Ohio's election administration needs consistent with its general and voting-age population in 1980. Florida's population in both categories is significantly greater, justifying Florida's earlier deadline. Although technology has progressed significantly during the past decade, enabling many Florida counties to verify petition signatures more rapidly, not all 67 county supervisors of elections are currently able to verify signatures by computer. Although Florida's deadline is, as plaintiffs claim, among the earliest of all of the fifty states and the District of Columbia, it is by no means unconstitutionally early in light of the fact that the signature verification process in Florida alone takes a considerable amount of time. The fact that nearly one-third of the states and the District of Columbia have filing deadlines prior to August 1 also makes it highly unlikely that Florida's deadline is unconstitutionally early.[16] Furthermore, in holding Alabama's March deadline unconstitutional, the Eleventh Circuit stated that although "the State has a valid and compelling interest in requiring a minor party to submit its qualifying petitions and nominate its candidates *at a time substantially prior to the election,"* the state did not adequately justify why this procedure had to occur in March when it had previously occurred in July. *Hand,* 933 F.2d at 1576 (emphasis added). Implicit in this reasoning is the premise that a July deadline, if properly justified, is not unconstitutionally early. Finally, although the ballots may not be able to be printed until after the second primary, Florida's decision to require petitions to be filed by July 15 is sensible. Verifying signatures is not the supervisors' only duty after July 15; they must also conduct the September 1st and 29th primaries, in addition to overseeing voter registration and performing other regular duties. Allowing supervisors of elections to verify signatures in July and August permits them to focus their attention towards these other duties in September and October.

The court concludes that Florida has adequately justified its need for a July deadline. Unlike *Fulani,* where Florida's interests justified only the charging of a fee to verify signatures but did not justify allowing all but minor party candidates to waive the fee, and unlike *Hand,* where Alabama's interests did not adequately justify a minor party filing deadline seven months prior to the election, Florida's July deadlines are justified for the reasons set forth above.

Accordingly, it is ORDERED:

1. Defendant's motion for Summary Judgment (document 5) is GRANTED.

2. Plaintiff's (Cross) Motion for Summary Judgment (document 17) is DENIED.

3. The Clerk is directed to enter judgment accordingly.

DONE AND ORDERED.

---

16. Three states currently have filing deadlines prior to July 1. Another five, including Florida, have filing deadlines after July 1 but before July 15. An additional eight have filing deadlines after July 16 but before August 1. Twenty-three have filing deadlines between August 2 and August 31. Twelve have deadlines after August 31.