United States Court of Appeals,

Fifth Circuit.

No. 95-50172.

TEXAS INDEPENDENT PARTY, et al., Plaintiffs-Appellants,

v.

Ronald KIRK, Defendant-Appellee.

June 3, 1996.

Appeal from the United States District Court for the Western District of Texas.

Before JOLLY, JONES and BENAVIDES, Circuit Judges.

BENAVIDES, Circuit Judge:

In this appeal, we resolve a constitutional attack on certain provisions of the Texas Election Code. A newly-formed political party, several of its officers and candidates, and two independent candidates contend that the Election Code deadlines for filing a declaration of intent to run for office, holding nominating conventions, and submitting petitions are simply too early in violation of the First and Fourteenth Amendments. Additionally, the independent candidates challenge the requirement that voter registration numbers must be included on their nominating petitions. Because we conclude that the challenged deadlines are reasonable, nondiscriminatory regulations, justified by legitimate state interests, we principally affirm the judgment of the district court. However, we hold that the voter registration number requirement is unduly burdensome and reverse the judgment with respect to that single provision.

TEXAS ELECTORAL SCHEME

Texas has a detailed statutory scheme for the regulation of political parties as it relates to the nomination of candidates for the general election ballot. The basic framework provides four nomination methods. Major political parties, those polling 20% or more of the total votes cast in the most recent gubernatorial general election, must nominate candidates through a statewide primary election. Tex.Elec.Code Ann. § 172.001 (West 1986). Political parties polling at least 2% but less than 20% in the previous gubernatorial election may choose to nominate candidates through either

a primary election or through nominating conventions. *Id.* § 172.002(a). Those minor political parties with less than 2% support in the past gubernatorial election or those that did not field a gubernatorial candidate in such election must nominate candidates through a process of precinct, county, and state conventions. *Id.* § 181.003. If sufficient participation is not evidenced at the conventions, the circulation of petitions is also required. *Id.* § 181.005. Finally, unaffiliated or independent candidates qualify by application and petition signed by a specified percentage of the vote cast for governor in the relevant electoral district. *Id.* §§ 142.002, .007. This statutory scheme is constitutional. *See American Party of Texas v. White,* 415 U.S. 767, 780-81, 94 S.Ct. 1296, 1305-06, 39 L.Ed.2d 744 (1974).

This detailed nominating process including primary elections, nominating conventions, applications, and petitions naturally involves a series of deadlines. These deadlines emanate from the date of the primary election. In 1986, the Texas legislature, motivated by the desire to participate in the nationwide "Super Tuesday" presidential primary, moved the date of the primary election from the first Saturday in May to the first Tuesday after the first Monday in March. When the primary election was moved up to "Super Tuesday," a corresponding shift in a variety of other deadlines occurred. These earlier deadlines are at the core of this controversy.

To be entitled to a place on the general election ballot, all candidates are required to file a declaration of intent to run for office.[1] The declaration is basically a simple matter that requires only the candidate's name, address, and office sought.[2] Tex.Elec.Code Ann. § 142.002 (West 1986). In general, this declaration of intent to run for office must be filed by January 2nd of the election year. *Id.* §§ 142.002(b), 172.023(a), 181.0041, 181.033(a) (West 1986 & Supp.1996). In 1994, however, the deadline fell on a weekend and was therefore extended to January 3rd making the declaration due

---

[1]Nominees of major political parties file their declarations with party officials. Tex.Elec.Code Ann. § 172.022 (West 1986). Applications for nomination by convention are filed with party officials who in turn must file them with the Secretary of State. *Id.* § 181.032. Independent candidates file with the Secretary of State for statewide or district office or the county judge for county or precinct office. *Id.* § 142.005.

[2]Candidates of parties nominating by primary election must also pay a filing fee. *See* Tex.Elec.Code Ann. §§ 172.021, .024 (West 1986 & Supp.1996).

approximately two months prior to the March 8th primary. *See id.* § 1.006 (West 1986) (effect of weekend or holiday).

In addition to the deadline for the declaration of intent, the Texas Election Code establishes a timetable for the minor party nominating conventions. The timing of the precinct, county, and district nominating conventions is linked to the primary election date. The precinct convention is held on the same day as the primary election and is for the sole purpose of selecting delegates to the county or district convention. *Id.* § 181.061(c) (West Supp.1996). The county convention is held on the first Saturday following the primary election, and is for the selection of nominees for county offices. *Id.* §§ 181.061(c), 182.005. The district convention is held on the second Saturday following the primary election, and is for the purpose of selecting nominees for multi-county offices. *Id.* § 181.061(b). The state convention is held on the second Saturday in June. *Id.* § 181.061(a) (West 1986). Pursuant to this statutory scheme, in 1994 the primary election and precinct conventions were to be held on March 8th; county and district conventions were to be held on March 12th and 19th respectively; state conventions were to be held on June 11th.[3]

A minor political party required to nominate by the convention process and independent candidates must also qualify to appear on the ballot by showing sufficient support. In order to qualify, the political party must file with the Secretary of State a list of precinct convention participants indicating a total number of participants equal to one percent of the total votes received by all candidates for governor in the most recent general election. *Id.* § 181.005(a). In 1994, this threshold number was 38,927. However, an inadequate number of precinct convention participants does not preclude a minor party's participation in the general election. If the number of precinct participants fails to meet the threshold, the party can supplement the list with petitions. Under the Election Code, the party has seventy-five days from the date of the precinct convention to complete the petitioning. *Id.* In 1994, this deadline fell on May 23rd.

---

[3]In addition to the primary election, the major parties also hold precinct, county, and district conventions on the same dates. *See* Tex.Elec.Code Ann. §§ 174.022(a), .063 (West 1986). The state conventions may be convened on any day in June. *Id.* § 174.092(a). In 1994, the State Republican Convention was held on June 11th.

Similarly, independent candidates for statewide office seeking a place on the general election ballot must file a petition with the number of signatures equal to one percent of the total vote received by all candidates for governor in the last election. *Id.* § 142.007(1). Independent candidates for district, county, or precinct office must file a petition with the lesser of 500 or five percent of the total vote received in the district, county, or precinct, as applicable, by all candidates for governor in the last election. *Id.* § 142.007(2). An independent candidate has thirty days from the date of the primary runoff election to complete the petitioning. *Id.* § 142.006 (West Supp.1996). In 1994, this deadline fell on May 12, 1994.

In order to validly support a petition, a signer of a petition must not have voted in the general or runoff primary election. *Id.* § 142.009 (West 1986). The Texas Election Code also requires that the petition must include the signer's name, address, and voter registration number. *Id.* § 141.063(2).

## THE CONTROVERSY

The plaintiffs in this case are the newly-formed Texas Independent Party, several of its officers, eight candidates who sought the party's nomination for public office in the general election, and two independent candidates for public office in the general election (collectively, "Appellants"). On March 10, 1994, Appellants sued the Secretary of State seeking declaratory and injunctive relief from the Election Code deadlines contending that they unduly burdened their First and Fourteenth Amendment rights. The essence of Appellants' constitutional challenge is that these deadlines are simply too early.

Specifically, Appellants challenge the January 2nd deadline for filing declarations of intent. Appellants also challenge the specific dates required for minor-party precinct, county, district, and state conventions. Additionally, Appellants challenge the dates upon which nominating petitions for minor parties and independent candidates must be submitted to the Secretary of State. Finally, Appellants raise one challenge to the substance of the electoral scheme, *i.e.,* the requirement of voter registration numbers for signers of independent candidate petitions.

The district court referred this case to the magistrate judge. Both sides filed motions for summary judgment. The magistrate judge recommended granting the defendant Secretary of State's

motion and denying the plaintiffs' motion.  The basis for the magistrate judge's recommendation was that the challenged deadlines were reasonable, nondiscriminatory restrictions that were supported by the State's legitimate regulatory interests.  On January 25, 1995, the district court approved and adopted the recommendation.  This appeal ensued.

*ANDERSON/BURDICK* METHODOLOGY

Voting is of the most fundamental significance in our constitutional system.  *Burdick v. Takushi,* 504 U.S. 428, 433, 112 S.Ct. 2059, 2063, 119 L.Ed.2d 245 (1992).  However, the right to vote in any manner and the right to associate for political purposes through the ballot are not absolute.  *Id.*  As a practical matter, there must be substantial regulation of elections to ensure fairness, honesty, and order.  *Anderson v. Celebrezze,* 460 U.S. 780, 788, 103 S.Ct. 1564, 1569-70, 75 L.Ed.2d 547 (1983).  These necessary regulations invariably impose some burdens upon voters.  Consequently, every voting regulation is not subject to strict scrutiny requiring that the regulation be narrowly tailored to advance a compelling state interest.  *Burdick,* 504 U.S. at 433, 112 S.Ct. at 2063.  Rather, the Supreme Court has clearly articulated that a flexible standard applies.  This methodology, forged in *Anderson* and refined in *Burdick* guides us today.

A court considering a challenge to a state election law must weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments against the precise interests put forward by the State as justifications for the burden imposed by its rule.  *Id.* at 434, 112 S.Ct. at 2063-64;  *Anderson,* 460 U.S. at 789, 103 S.Ct. at 1570.  The rigorousness of the inquiry into the propriety of the state election law depends upon the extent to which the challenged regulation burdens First and Fourteenth Amendment rights.  *Burdick,* 504 U.S. at 434, 112 S.Ct. at 2063-64.  When those rights are subjected to severe restriction, the regulation must be narrowly tailored to advance a compelling state interest.  *Id.*  But when a state election law imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions.  *Id.; Anderson,* 460 U.S. at 788, 103 S.Ct. at 1569-70.

The Supreme Court's application of this rubric in *Anderson* and *Burdick* illustrates these

principles at work. In *Anderson,* the State of Ohio required no minating petitions for independent presidential candidates to be filed on March 20, 1980. 460 U.S. at 782-83, 103 S.Ct. at 1566-67. John Anderson did not announce his independent candidacy for the office of President until April 24, 1980. *Id.* at 782, 103 S.Ct. at 1566. His Ohio supporters gathered the required petition signatures by May 16, 1980, but Anderson was denied a place on the ballot for failure to submit the petitions by the March 20th deadline. *Id.* The Supreme Court, applying the standard recounted above, found this deadline impermissible.

Initially, the Court examined the extent of the burden and concluded that it was substantial. The Court relied on several factors in reaching this conclusion. First, the early filing deadline placed independent presidential candidates at a competitive disadvantage. Independents were required to file by mid-March, but the major parties had flexibility because Ohio law provided for automatic inclusion of major-party nominees. *Id.* at 790-91 & n. 11, 103 S.Ct. at 1570-71 & n. 11. Hence, independents were forced to identify themselves early, but the identities of the major-party opponents were not established until after the August national conventions. *Id.*

The Court also found that the Ohio requirement burdened the signature-gathering process. Because the independent candidates' petitions were due by mid-March, they would have to be gathered "[w]hen the primary campaigns are far in the future." *Id.* at 792, 103 S.Ct. at 1572. Thus the early deadline hampered independent candidates' organizing efforts such as potential harm to volunteer recruiting, publicity, and campaign contributions. *Id.*

Additionally, the Court placed the state-imposed restriction in the context of a national presidential election. Describing a "uniquely important national interest," the Court noted that in a presidential election a state's stringent ballot access requirements, including filing deadlines, has an impact beyond its borders. *Id.* at 794-95, 103 S.Ct. at 1572-73. "[T]he State has a less important interest in regulating Presidential elections than statewide or local elections, because the outcome of the former will be largely determined by voters beyond the State's boundaries." *Id.* at 795, 103 S.Ct. at 1573. The Court concluded that Ohio's filing deadline placed a significant state-imposed restriction on a nationwide election process. *Id.*

Having concluded that the burden imposed by the Ohio restriction was significant, the Court turned its attention to the State's proffered justifications: voter education, equal treatment, and political stability. In an age of instantaneous verbal and visual communication and in the context of intensely publicized presidential elections, the Court found the legitimate state interest in fostering voter education insufficient to justify the significant burden. *Id.* at 797, 103 S.Ct. at 1574. Similarly, the Court rejected the equal treatment justification noting that even though candidates in the primary election must declare candidacy on the same date as independents, the consequence of failing to meet the requirement was entirely different. *Id.* at 799, 103 S.Ct. at 1575. The names of the Democratic and Republican nominees would appear on the ballot even if they decided to run after the March deadline had passed; the independent was forever denied access. Finally, the Court rejected Ohio's political stability interest as merely a desire to protect existing political parties. *Id.* at 801, 103 S.Ct. at 1576.

In sum, the Court found that the discriminatory Ohio regulation unduly burdened the rights of voters to express their support for the independent Anderson. In an election of nationwide importance, these burdens outweighed the state's interest in imposing the March deadline. *Id.* at 805-06, 103 S.Ct. at 1578-79. As a result, the Court struck down the offensive state election law.

The Court used *Anderson* 's analytical process but came to a different conclusion when it considered the constitutionality of Hawaii's prohibition on write-in voting in *Burdick.* After reiterating the flexible standard announced in *Anderson,* the Court assessed the extent of the burden created by the complete prohibition on write-in votes. In Hawaii, there were three ways to gain access to the primary ballot. First, a party petition could be filed 150 days before the primary with 1% of the State's registered voters. *Burdick,* 504 U.S. at 435, 112 S.Ct. at 2064. Sixty days before the primary, candidates filed nominating papers with a specified number of signatures. *Id.* The winner in each party advanced to the general election. A second method was through the established party route. Established parties that had qualified by petition for three consecutive years did not have to file party petitions for ten years. *Id.* at 436, 112 S.Ct. at 2064-65. Like new parties, the candidates were required to file nominating papers sixty days before the primary. The third method

was through a nonpartisan ballot. Nonpartisans could be placed on the nonpartisan primary ballot by filing nominating papers sixty days before the primary. *Id.*

The Court characterized this system as one of "easy access" to the ballot until the cutoff date for filing nominating petitions, two months before the primary. *Id.* Consequently, any burden was borne only by those who failed to identify their candidate early enough. The Court reiterated that it gave "little weight to "the interest the candidate and his supporters may have in making a late rather than an early decision to seek independent ballot status.' " *Id.* at 437, 112 S.Ct. at 2065 (quoting *Storer v. Brown,* 415 U.S. 724, 736, 94 S.Ct. 1274, 1282, 39 L.Ed.2d 714 (1974)). The Court concluded that Hawaii's ban on write-in votes imposed only a limited burden on voters' rights. *Id.* at 438-39, 112 S.Ct. at 2065-66.

Because the burden was slight, the State did not have to establish a compelling interest to "tip the constitutional scales in its direction." *Id.* at 439, 112 S.Ct. at 2066. The Court found that Hawaii's goals of averting divisive sore-loser candidacies, promotion of a two-stage primary-general election process, and prevention of party raiding were legitimate. *Id.* at 439-40, 112 S.Ct. at 2066-67. Because the Court did not require strict scrutiny, the State's interests were thus sufficient to outweigh the limited burden that the write-in ban imposed on Hawaii's voters. *Id.* at 441, 112 S.Ct. at 2067.

*Anderson* and *Burdick* provide us with the tools to resolve the challenge made today to the provisions of the Texas Election Code. We must first assess the extent of the burden the provisions create on the rights of voters. If the burden is great, the State must provide a compelling state interest and narrow tailoring of its rule. However, if the burden is slight, legitimate state interests will be sufficient to support the constitutionality of the provisions.

### *ANDERSON/BURDICK* APPLIED

#### A. BURDENS IMPOSED

Appellants first challenge the January 2nd deadline requirement for filing the declaration of intent to run for office. They argue that this deadline is a great burden because failure to comply forever denies minor-party and independent candidates access to the ballot. Appellants seize upon

*Anderson* and contend that if a March 20th petitioning deadline is constitutionally impermissible then the January 2nd declaration deadline must similarly fall. We conclude otherwise.

The required declaration of intent is simply an indication by the candidate of the intention to seek public office. It requires little more than the candidate's name, address, and office sought. Tex.Elec.Code Ann. § 142.002(b) (West 1986). We can only conclude the obvious: Providing one's name, address, and office sought is not a great burden. Indeed, furnishing such information is not only a slight requirement, but is essential for conducting fair, honest, and orderly elections. Appellants recognize this fact and focus their attack not on *what* they are required to do, but *when* they are required to do it. Fundamentally, they challenge the deadline because it requires them to *decide* to run for office sooner rather than later. But the Supreme Court has twice instructed that such a consideration is of little weight.

In *Storer v. Brown,* the Court upheld a ballot access law that refused to recognize independent candidates until a year after they had disaffiliated from a political party. 415 U.S. at 726, 736, 94 S.Ct. at 1277, 1282. The Court gave little weight to the fact that those candidates must make the decision to seek office more than a year in advance. *Id.* Likewise, in *Burdick* the Court gave little weight to the plight of would-be candidates who failed to decide to run for office and file the required nominating papers two months before the primary election. 504 U.S. at 437, 112 S.Ct. at 2065. Hence, the Supreme Court fails to see any undue burden occasioned by requiring candidates to decide to seek public office more than a year in advance of the general election and two months prior to the primary. Much like the timetables approved in *Storer* and *Burdick,* the Texas declaration of intent deadline merely requires a candidate to decide to run for office approximately eleven months before the general election and two months before the primary. In the context of a nondiscriminatory deadline that applies to all parties and candidates, we see little burden from the declaration requirement.

Appellants' contention that they fall squarely within *Anderson* is incorrect. While the Supreme Court found that Ohio's March 20th deadline was impermissible, it did so in a very different context. First, the Court recognized that Ohio's deadline was discriminatory because only independent

candidates were denied access while major-party candidates were placed on the ballot regardless of compliance. In contrast, the Texas requirement is nondiscriminatory. It applies to all candidates, major-party, minor-party, and independents alike. Failure to decide to seek public office by the January deadline denies ballot access across the board. Secondly, Ohio's deadline was a *petitioning* deadline where Anderson was required to have 14,500 signatures by March 20th. In contrast, Texas requires only an indication of intent to run; no petitions are required at this stage. Furthermore, the Court specifically cast the burden in context of requiring petitions be completed far in advance of the primary elections. Such is not the case here where petitioning does not commence until *after* the primary election and petitions are not due until late May.[4] Finally, the Court emphasized that the burden was magnified in *Anderson* because of the implications of a national election contest. Ohio's restriction burdened the nationwide electoral process. The challenged restriction here does not apply to presidential contests. *See* Tex.Elec.Code Ann. §§ 192.031, .032(b), (c) (West 1986 & Supp.1996) (describing requirements for placement of presidential candidates on the general election ballot).

Guided by the Supreme Court's jurisprudence in this area, we conclude that the January 2nd deadline for filing the declaration of intent is not a significant burden. In 1994, 92 independent candidates submitted valid declarations by the January deadline. As this compliance illustrates, the deadline merely requires a candidate to decide to run for office. This burden is slight.

Appellants next challenge the deadline requirements for holding the various nominating conventions. As with the deadline for the declaration of intent, Appellants do not contend that the requirement is impermissible. Rather, they argue that deadlines for holding the various conventions are too early thereby restricting the choices available to Texas voters.

---

[4]Appellants also rely on a pre-*Burdick* case. In *New Alliance Party of Alabama v. Hand,* 933 F.2d 1568 (11th Cir.1991), a panel of the Eleventh Circuit affirmed, by adoption of the district court's opinion, that Alabama's April 6th filing deadline was constitutionally impermissible. However, the Alabama deadline was not merely a declaration of intent, but also required filing of signature petitions. *Hand,* 933 F.2d at 1570. Moreover, the petition deadline was sixty days *prior* to the primary. *Id.* Thus, the Alabama deadline created the same type of discriminatory impact on minor parties as the early petition deadline in *Anderson* because signatures had to be obtained far in advance of the primary at a time when the major parties had not selected their candidates. This situation is, of course, readily distinguishable from the Texas scheme. The early January deadline is merely a nondiscriminatory declaration deadline. Petitions are not required until May and can only be obtained *after* the primary election.

We have little difficulty in concluding that the timeframe requirements for the nominating conventions are not a significant burden. The Supreme Court has already examined the framework of the Texas electoral scheme and held that requiring minor political parties to nominate candidates through a convention process is constitutionally permissible. *See White,* 415 U.S. at 780-81, 94 S.Ct. at 1305-06. Moreover, the convention process approved by the Supreme Court in *White* held the various nominating conventions sequentially, with precinct conventions on the same date as the statewide primaries for the major parties, the county conventions on the following Saturday, and the state convention on the second Saturday in June. *Id.* at 773-74, 94 S.Ct. at 1302-03. This is precisely the same process Texas employs today. The only difference is that at the time of *White* Texas held its primary election in May. The switch to "Super Tuesday" in March caused a commensurate switch in the dates of the precinct, county, and district conventions. We find this change only a minor burden, given the Supreme Court's holding that the Texas electoral system, with a convention nominating process linked to the date of the primary election, "in no way freezes the status quo, but implicitly recognizes the potential fluidity of American political life" and "affords minority political parties a real and essentially equal opportunity for ballot qualification." *Id.* at 787-88, 94 S.Ct. at 1309-10.

Finally, Appellants challenge the May deadlines for filing petitions by minor-party and independent candidates. Under the Election Code, minor parties have seventy-five days from the date of the precinct convention to complete the petitioning. In 1994, this deadline fell on May 23rd. An independent candidate has thirty days from the date of the primary runoff election to complete the petitioning. In 1994, this deadline fell on May 12, 1994. As with the other deadlines, Appellants' sole contention is that these deadlines come too early.

The Texas requirement that minor parties and independents demonstrate sufficient electoral support for ballot access was also approved by the Supreme Court in *White. Id.* at 782-83, 94 S.Ct. at 1306-07. The electoral scheme approved in *White* included a petition-gathering period that began after the primary election. *Id.* at 784-85, 94 S.Ct. at 1307-08. Furthermore, the amount of time allotted for obtaining the petition signatures also is constitutional. *See id.* at 786-88, 94 S.Ct. at

1308-09.  In light of *White,* we are naturally reluctant to categorize the petitioning deadlines as a significant burden.[5]

Appellants once again rely on *Anderson.*  However, the Texas requirement differs from *Anderson* in two significant ways.  As previously noted, Ohio's March deadline required petitions to be submitted *before* the primary season began whereas in Texas signatures cannot be gathered and petitions cannot be submitted until *after* the primary.  Thus any concern that the deadline might hamper organizing efforts is lessened because of the heightened political interest in the aftermath of the primary election.  Additionally, at the time of *Anderson* there was no "Super Tuesday."  With the advent of "Super Tuesday" all aspects of Texas political life have been ratcheted forward.  Requiring minor parties and independent candidates to meet constitutional petitioning requirements at an earlier stage is not a severe burden.

B. LEGITIMATE STATE INTERESTS

Concluding that the challenged deadlines are reasonable, nondiscriminatory restrictions on the rights of voters, we turn to the State's justifications.  Because the burdens are not severe, the State need not present narrowly-tailored regulations to advance a compelling state interest.  *Burdick,* 504 U.S. at 434, 112 S.Ct. at 2063-64.  Rather, the State's important regulatory interests are sufficient to justify the regulations.  *Id.*

The State of Texas advances several legitimate interests to support the deadlines.  Initially, the State notes that equal treatment warrants the provisions.  By requiring all candidates to indicate their intention to run for office on the same date, the State places all candidates in the same position.  As for the convention process, it serves as a substitute for the primary election process.  Thus the minor parties nominate candidates through the conventions around the same time as major parties nominate through the primary election.  This is not more burdensome than what is required of the

_____

[5]We also note that in 1994 sixteen independent candidates submitted valid petitions by the May deadline.  Similarly, two minor parties, the Libertarian Party in 1988, 1990, and 1992, and the New Alliance Party in 1988, fulfilled the statutory requirements to appear on the ballot.

major parties.[6]  Similarly, the petitioning deadlines are a surrogate for participation in the primary elections.  Minor-party candidates and independents do not participate in the primary.  Nonetheless, the State has a legitimate goal of requiring a demonstration of sufficient public support to gain access to the ballot.  Major-party candidates demonstrate support at the time of the primary election.  A petition deadline linked to the primary election date that allows sufficient time to gather signatures[7] merely requires other candidates to demonstrate public support around the same time as their major-party opponents.

Additionally, the State notes that voter education is enhanced by the deadlines.  These deadlines are designed to allow the identification of candidates at an early date to allow voters to decide whom to support.  The State argues that this is particularly important given the requirement that primary election voters are prohibited from signing nominating petitions for minor-party or independent candidates.  *See* Tex.Elec.Code Ann. § 142.009 (West 1986).  Thus, voters need to identify all potential candidates prior to the primary because the decision to vote in the primary election is essentially one to eschew the nominating process of minor-party or independent candidates.

These justifications proffered by the State for the deadlines are sufficient under the standard announced in *Anderson* and *Burdick* to support the reasonable, nondiscriminatory restrictions.  The State's regulatory interests in equal treatment of candidates and fostering an informed electorate provide ample reason for the deadlines.  We hold that these legitimate interests asserted by the State are sufficient to outweigh the limited burden the challenged deadlines impose upon the rights of Texas voters.[8]

---

[6]In fact, the Supreme Court rejected the idea that the convention process was more burdensome and intimated that the major parties may actually have a greater burden under the Texas system because they must conduct both a primary and runoff election and subsequently hold various precinct, county, and state conventions to promulgate party platforms and conduct other party business.  *White,* 415 U.S. at 781-82, 94 S.Ct. at 1306.

[7]The Supreme Court has found the number of days allotted to petition-gathering under the Texas scheme constitutionally permissible.  *White,* 415 U.S. at 786-88, 94 S.Ct. at 1308-09.

[8]Because these legitimate state interests are sufficient to support the nondiscriminatory regulations at issue here, we need not address the State's other proffered justifications for the

VOTER REGISTRATION NUMBER REQUIREMENT

While none of the challenged deadlines create an undue burden on ballot access, a different conclusion is compelled by the voter registration number requirement. The Texas Election Code requires that nominating petitions must contain each signer's voter registration number. *Id.* § 141.063(2)(B). In *Pilcher v. Rains,* 853 F.2d 334 (5th Cir.1988), we held that this requirement created an impermissible burden on ballot access by minor political parties and enjoined its use. The two independent candidates in this lawsuit contend that the State continues to require independents to comply with this constitutionally-infirm provision. The recommendation of the magistrate judge did not specifically address the voter registration number requirement. The judgment of the district court, adopting the magistrate judge's recommendation, granted the State's motion for summary judgment on "any and all claims."

Despite our holding in *Pilcher,* the State admits that it requires signature petitions other than those of minor part ies to include voter registration numbers. Defendant's Original Answer ¶ 43. However, the State offers no defense for the registration number requirement.[9] We have no difficulty in holding that the requirement is constitutionally impermissible. *Pilcher* controls. The State offers no rationale why the requirement that is unconstitutional as applied to minor parties is somehow acceptable as to independent candidates. Similarly, we decline to craft such an illogical distinction.

CONCLUSION

The provisions of the Texas Election Code establishing deadlines for the declarations of intent, for minor-party nominating conventions, and for the petitioning process do not violate the First and

---

regulations.

[9]The State's sole contention on appeal is that the independent candidates, Ken Henderson and Terry Moser, lack standing. In this regard we note that Henderson clearly has a personal stake in the outcome of this controversy sufficient to demonstrate standing to challenge this ballot access regulation. *See Henderson v. Fort Worth Indep. Sch. Dist.,* 526 F.2d 286, 288-89 n. 1 (5th Cir.1976); *McLain v. Meier,* 851 F.2d 1045, 1048 (8th Cir.1988); *see also Stevenson v. State Bd. of Elections,* 638 F.Supp. 547, 549 (N.D.Ill.) (failure to tender petition and have it rejected does not deprive candidate of standing), *aff'd,* 794 F.2d 1176 (7th Cir.1986). Because Henderson has standing, we conclude that the attack on the voter registration number requirement is properly before us for review. Thus, we need not address the State's standing challenge as it relates to Moser.

Fourteenth Amendments. The requirement that voter registration numbers be included on independent candidate petitions, however, is unduly burdensome and constitutionally impermissible. We AFFIRM the judgment in part as it relates to the challenged deadlines and REVERSE in part as it relates to the voter registration number requirement.