Carolyn CAMPBELL, et al., Plaintiffs,

v.

Jane D. HULL, Defendant.

No. Civ–96–444–T–WDB.

United States District Court,
D. Arizona.

April 5, 1999.

Carolyn Campbell, Tucson, AZ, pro se.

Christopher F. Clarke, Washington, DC, for Carolyn Campbell, plaintiff.

Sloane Haywood, Tucson, AZ, pro se.

Christopher F. Clarke, Washington, DC, for Sloane Haywood, plaintiff.

John Kromko, Tucson, AZ, pro se.

Christopher F. Clarke, Washington, DC, for John Kromko, plaintiff.

M. Colleen Connor, Arizona Attorney General's Office, Phoenix, AZ, for Jane Dee Hull, Secretary of State, State of Arizona, defendant.

## ORDER

WILLIAM D. BROWNING, Senior District Judge.

Pending before the Court are Defendant's Motion for Summary Judgment ("Def.'s Mot.") filed October 14, 1997, Plaintiffs' Motion for Summary Judgment ("Pls.' Mot.") filed November 19, 1997, and Oppositions and Replies to each. On August 4, 1998, the Honorable Raymond Terlizzi, United States Magistrate Judge, filed his Report and Recommendation, recommending that the District Court grant Defendant's Motion and deny Plaintiffs' Motion. The Court granted Plaintiffs' August 17, 1998 Motion for an Extension of Time to File Objections to Magistrate's Report and Recommendation. On September 21, 1998, Plaintiffs filed their Objection to the Magistrate's Report and Recommendation. A hearing on the cross motions for summary judgment was held in front of the Honorable William D. Browning on March 16, 1999. After a thorough and *de novo* review of the record and the additional evidence presented by Plaintiffs in their objection to the Report and Recommendation and both parties at the hearing, the Court declines to accept the recommendation of the Magistrate Judge.

*FACTUAL AND PROCEDURAL BACKGROUND*

The facts are essentially undisputed. Plaintiffs Campbell and Haywood are members of the Arizona Green Party who sought office as, and circulated petitions to become, presidential elector candidates on behalf of their party and its candidate, Ralph Nader, in the 1996 presidential election. (Compl. at ¶¶ 2, 3.) Plaintiff Kromko, a registered Democrat, signed a nominating petition for presidential elector candi-

dates belonging to the Green Party. (*Id.* at ¶ 4.) Defendant Hull was, at the time this action commenced, the Secretary of State for the state of Arizona, and as such, the chief administrator of the state's electoral laws and process; she was being sued in her official capacity. (*Id.* at ¶ 5.) Hull has since become the Governor; the Secretary of State is now Betsey Bayliss. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Bayliss, as Hull's successor, is automatically substituted as a party.

In Arizona, political parties are either "qualified" parties, or "non-qualified" parties, depending on how many votes the party received in the last election. Pursuant to A.R.S. § 16–341, to be placed on the general election ballot, candidates from a "non-qualified" party such as the Green Party must circulate nomination petitions and obtain a certain minimum number of valid signatures. A.R.S. § 16–341(E). This is different from the process required of "qualified" parties; pursuant to A.R.S. § 16–344, the respective state chairmen of the qualified parties appoint their own party's candidates for presidential electors. A.R.S. § 16–344. Those candidates appear on the general election ballot without the candidates having to circulate petitions. (Def.'s Mot. at 12.) In March of 1996, the qualified parties were the Democratic, Republican and Libertarian parties. (Def.'s Statement of Facts ("DSOF") in Supp. of Mot.Summ.J. at ¶ 13.)

Members of the Green Party began circulating nominating petitions for presidential elector candidates supporting Ralph Nader on May 4, 1996. (Pl.'s Statement of Facts ("PSOF") at ¶ 21.) They were required, pursuant to A.R.S. § 16–341(E), to obtain signatures equal to 3% of the qualified electors (registered voters) in the State of Arizona at the last election who were *not* members of a qualified political party. (DSOF at ¶ 8.) At the time of the 1994 election, there were 260,404 such voters. (DSOF at ¶ 10.) Accordingly, Green

Party candidates needed to obtain 7,813 valid signatures to appear on the 1996 general election ballot. (*Id.*) Only registered voters who were not registered Democrats, Republicans or Libertarians could validly sign a petition for Green Party presidential elector candidates. (DSOF at ¶¶ 8, 13.) Thus, John Kromko, a registered Democrat, could not validly sign a petition for Green Party candidates pursuant to A.R.S. § 16–341. (Compl. at 2.)

The only qualification for signors of presidential elector candidate petitions pursuant to A.R.S. § 16–341 is that they not be members of a qualified political party. (DSOF at ¶ 12.) The petitions do not have to be notarized, there is no commencement date for collecting signatures (just an ending deadline), one signature on a petition can count as a signature for up to eight candidates listed on one petition, and there is no geographical limitation (a signature gatherer can obtain signatures from qualified signors in any county in Arizona). (*Id.* at ¶¶ 18–22.)

As of March 1, 1996, Arizona had an applicable pool of 273,772 registered voters who were not members of a qualified party, and thus were eligible to sign a nomination petition. (*Id.* at ¶ 14.) At the County Recorder's offices one can discover the names of all registered voters in a particular county eligible to sign petitions for candidates of non-qualified parties. (*Id.* at ¶ 30.) The lists are available for review for free, or a list can be obtained for a price (five cents per name for a paper list or ten cents per name for an electronic list). A.R.S. § 16–168(E). For the number of eligible signors involved in this case, someone would have had to copy over a quarter of a million names by hand, or purchase a list on paper for $13,689 (273,772 × $.05), or purchase an electronic list (which would be necessary for mass mailing purposes) for $27,377 (273,772 × $.10). These numbers are slightly in dispute and they are recited here for demonstrative purposes only.[1] Plaintiffs obtained a list

---

**1.** Plaintiff used the October 1996 total of eligible petition signors of 295,499 and, thus,

claims it would have cost $29,550 for the list. (PSOF at ¶ 41.)

of such registered voters in Pima County, but only of those already members of the Green Party. (DSOF at ¶ 31.)

Presidential elector candidates must file their nomination petitions not less than 75 nor more than 105 days before the primary election. *See* A.R.S. § 16–341(C) and § 16–311. In 1996, the primary election was held on September 10 pursuant to A.R.S. § 16–201, therefore, the petition filing deadline was June 27, 1996. (Def.'s Mot. at 5.) On that day, Green Party volunteers turned in either 4,242 or 4,257 signatures to the Secretary of State's office.[2] (DSOF at ¶¶ 16, 17.) The Secretary determined that the number of signatures was insufficient to place Green Party electors representing their candidate Ralph Nader on the November 1996 general election ballot. (Compl. at ¶ 13.) Plaintiffs filed this action on July 3, 1996. (*Id.* at ¶ 14.)

Any candidate that fails to gain access to the general election ballot by obtaining signatures may still gain access as a write-in candidate, pursuant to A.R.S. § 16–312, without obtaining signatures, by filing a nomination form no later than fourteen days prior to the general election. (DSOF at ¶ 35.) The eight Green Party presidential elector candidates representing their party and its candidate, Ralph Nader, achieved write-in candidate status by following those procedures. (*Id.* at ¶ 36.) Plaintiff Kromko voted for them as write-in candidates in the 1996 general election. (*Id.* at ¶ 37.)

The current version of A.R.S. § 16–341 became effective January 1, 1994. (*Id.* at ¶ 60.) Since then there have been two statewide general elections, one in November 1994 and one in November 1996. (*Id.*) The office of presidential elector appeared on the ballot in November 1996, but not in 1994. (*Id.*) Two state legislative candidates belonging to a non-qualified party, the Natural Law Party, gained access to the general election ballot pursuant to A.R.S. § 16–341 in 1996. (*Id.* at ¶ 61.) No

presidential elector candidates from non-qualified parties made the general election ballot other than as write-in candidates. (Pls.' Mot. at 10.)

*STATEMENT OF THE CASE*

Plaintiffs challenge the constitutionality of three provisions of A.R.S. § 16–341:(1) A.R.S. § 16–341(C) in combination with A.R.S. § 16–311(A)—the deadline for submission of nomination petitions for presidential elector candidates; (2) A.R.S. § 16–341(C)—the requirement that signors of nomination petitions not be members of qualified political parties; and (3) A.R.S. § 16–341(E)—the percentage of signatures required on nomination petitions. Specifically, Plaintiffs claim that these provisions combine to severely burden their right to vote for the candidate of their choice, in violation of their rights to equal protection and due process under the Fourteenth Amendment and their right to free speech/freedom to associate under the First Amendment. Plaintiffs claim that the provisions make it virtually impossible for a reasonably diligent independent candidate to secure access to the Arizona ballot. Furthermore, Plaintiffs argue that Arizona's asserted interests are not sufficiently weighty to justify the harsh limitations on Plaintiffs' rights, and that the statute is not narrowly tailored to meet the state's less-than compelling interests.

Defendant argues that the burdens the statute imposes on minor-party candidates are *de minimis.* She argues that the statute's provisions are reasonable and non-discriminatory, and a diligent independent candidate could fulfill the requirements. She claims that any failure of Plaintiffs to gain ballot access is a result, not of any statutory hurdles, but of Plaintiffs' lack of due diligence in collecting signatures. She also claims that the statute furthers the state's interests in holding fair, honest and efficient elections, accomplishing necessary pre-election tasks, protecting party members' associational rights, and in prevent-

---

2. The receipt from the Secretary of State's office on June 27, 1996, shows 4,242 signa-  tures; a review by that office in September 1997 shows the total was actually 4,257.

ing voter confusion, ballot clutter, and frivolous candidacies.

### STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper where no genuine issue as to any material fact exists and the movant is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In making this determination, the Court considers the pleadings, depositions, answers to interrogatories, affidavits and admissions on file. *See* Fed.R.Civ.P. 56(c).

The initial burden rests on the moving party to point out the absence of any genuine issue of material fact, but the moving party need not support its motion with affidavits or other supporting materials. *See* Fed.R.Civ.P. 56(a); *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. Once satisfied, the burden shifts to the opponent to demonstrate through production of probative evidence that an issue of fact remains to be tried. *See Id.* at 323–24, 106 S.Ct. 2548. The non-moving party may not rest on mere denials of movant's pleadings, but must respond asserting specific facts showing a genuine issue exists precluding a grant of summary judgment. *See* Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. The ultimate question is whether the evidence "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986.)

The parties in this case have each filed Motions for Summary Judgment. They agree that there are no genuine issues of material fact in dispute; the parties disagree on the significance of the facts. They agree that the issues are essentially legal. Therefore, summary judgment is appropriate.

### DISCUSSION

■ The right to associate and form political parties for the advancement of common political goals and ideas is protected by the First and Fourteenth Amendments to the U.S. Constitution. *See Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 357, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997). "[F]reedom to engage in the advancement of beliefs and ideas is an inseparable aspect of the "liberty" assured by the Due Process Clause of the Fourteenth Amendment which embraces freedom of speech." *Anderson v. Celebrezze*, 460 U.S. 780, 787, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983) (citing *NAACP v. State of Alabama, ex rel. Patterson*, 357 U.S. 449, 460, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958)). Candidate eligibility requirements impact these basic constitutional rights of voters. *See Anderson v. Celebrezze*, 460 U.S. at 786, 103 S.Ct. 1564. Candidate eligibility requirements burden two different kinds of rights: "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Id.* at 787, 103 S.Ct. 1564. "Both of these rights, of course, rank among our most precious freedoms." *Id.*

■ "Although these rights of voters are fundamental, not all restrictions imposed by the States on candidates' eligibility for the ballot impose constitutionally suspect burdens on voter's right to associate or to choose among candidates." *Id.* at 788, 103 S.Ct. 1564. "[A]s a practical matter there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974). For example, "the United States Supreme Court has recognized that a State has a legitimate interest in regulating the number of candidates on the ballot." *Bullock v. Carter*, 405 U.S. 134, 145, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972). The mere fact that a State's system "creates barriers ... tending to limit the field of candidates from which voters might choose ... does

not of itself compel strict scrutiny." *Id.* at 143, 92 S.Ct. 849.

> There is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot— the interest, if no other, in avoiding confusion, deception and even frustration of the democratic process at the general election.

*Jenness v. Fortson,* 403 U.S. 431, 442, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971).

■ "Moreover, a State has an interest, if not a duty, to protect the integrity of its political processes from frivolous or fraudulent candidacies." *Bullock,* 405 U.S. at 145, 92 S.Ct. 849. These cases clearly establish the authority of the state of Arizona to impose some restrictions on ballot access for candidates of non-qualified political parties. However, Arizona's legitimate state interests must be "achieved by a means that does not unfairly or unnecessarily burden either a minority party's or an individual candidate's equally important interest in the continued availability of political opportunity." *Lubin v. Panish,* 415 U.S. 709, 716, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974).

*TEST FOR CONSTITUTIONALITY*

■ Laws imposing a burden on the right to vote is not necessarily subject to strict scrutiny. *See Burdick v. Takushi,* 504 U.S. 428, 432–33, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992). Although the right to vote is a fundamental right, the Supreme Court has recognized that states retain the power to regulate the times, places, and manner of holding their own elections. *See Id.* at 433, 112 S.Ct. 2059. The test for constitutionality of statutes affecting candidates' and, consequently, voters' rights requires a two-step process: first, the court must judge the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the Plaintiff seeks to vindicate; second, the court must identify and evaluate the precise interests put forward by the State as justifications for the burden

imposed by its rule. *See Anderson,* 460 U.S. at 789, 103 S.Ct. 1564.

■ The rigorousness of the Court's inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. *See Burdick,* 504 U.S. at 434, 112 S.Ct. 2059. When those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance." *Id.* (citation omitted). If the burden is slight, the procedures will survive review as long as they have a rational basis. *See Libertarian Party of Washington v. Munro,* 31 F.3d 759, 761 (9th Cir.1994). "[T]he State's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions." *Anderson,* 460 U.S. at 788, 103 S.Ct. 1564. Thus, the severity of the ballot access law's restrictions is directly proportional to the degree of scrutiny it will receive by a court. *See The Patriot Party of Pennsylvania v. Mitchell,* 826 F.Supp. 926, 934 (E.D.Pa.1993).

### A. Severity of Burden Imposed

■ "The right to vote is heavily burdened if that vote may be cast only for one of two parties at a time when other parties are clamoring for a place on the ballot." *Lubin,* 415 U.S. at 716, 94 S.Ct. 1315 (citation omitted). The interests involved are not merely those of parties or individual candidates; the voters can assert their preferences only through candidates or parties or both. *See Id.* Thus, the right of a party or an individual to a place on a ballot is intertwined with the rights of voters to cast their votes effectively and both are entitled to protection. *See Id.*

In determining the nature and magnitude of the burden that Arizona's procedures impose on independent candidates, the Court must examine the entire scheme regulating ballot access. *See Libertarian Party of Washington,* 31 F.3d at 761–62. The question is whether a "reasonably dili-

gent" independent candidate could be expected to satisfy the requirements, or if they will only rarely succeed in getting on the ballot. *See Storer*, 415 U.S. at 742, 94 S.Ct. 1274. Past experience is a helpful guide when determining the severity of the burden imposed. The current version of A.R.S. § 16–341 became effective on January 1, 1994. The only history with this specific statute is the fact that there were no independent presidential elector candidates on the ballot for the 1996 general election, although two state legislative candidates belonging to the Natural Law Party did gain ballot access. Additionally, from 1918 to 1949, Louisiana had a statute similar to A.R.S. § 16–341(C). During that time period, no independent or third-party statewide or federal candidate was able to get a place on the Louisiana ballot.

### 1. June 27 filing deadline

Plaintiffs argue that the Nader campaign grew from a single state candidacy in December 1995 to a nationwide effort in the summer of 1996. (PSOF at ¶¶ 4–36.) In April, when it appeared that Nader would succeed in mounting a national campaign, the Arizona Green Party decided to join the effort. (*Id.* at ¶ 17.) They began circulating petitions on May 4, 1996. Plaintiffs argue that at the rate the campaign was picking up steam, they would have been able to meet the signature requirement if they had an additional month, even considering the exclusion of major party members from the pool of eligible signors. (*Id.* at ¶ 30.) Defendant argues that if all Plaintiffs needed was 30 more days, they should have started collecting signatures earlier, rather than waiting until the eleventh hour. Plaintiffs counter that all months are not equal in an election year; what they needed was more time in the summer, as issues crystalized and voter interest increased. Additionally, Plaintiffs allege that although courts have upheld earlier deadlines in the context of non-presidential independent candidates, no court has upheld a deadline for filing nominating petitions for independent presidential candidates as early as Arizona's

June 27th deadline. Furthermore, the district court in Nevada granted a preliminary injunction that required Nevada to accept a nominating petition filed after its June 10th filing deadline. *See Fulani v. Lau*, CIV–92–535–ECR (1992).

Courts have recognized that an early filing deadline could have a notable impact on independent-minded voters. *See Anderson*, 460 U.S. at 790, 103 S.Ct. 1564. In election campaigns, particularly those national in scope, the candidates and the issues simply do not remain static over time. *See Id.* Indeed, several important third-party candidacies in American history were launched after the two major parties staked out their positions and selected their nominees at national conventions during the summer. *See Id.* at 791–92, 103 S.Ct. 1564.

In *Anderson*, the Court struck down a March deadline for filing independent parties' nominating petitions as too remote from the election. *See Id.* The Ohio statute at issue required petitions to be filed 229 days in advance of the election; if they were not timely filed, there was no alternative means of gaining access to the ballot via a write-in campaign. Non-partisan candidates also had to submit their petitions significantly earlier than the partisan candidates. *See Id.* The Court found that these provisions placed too severe a burden on independent-minded voters; if the deadline were later in the year, a newly emergent independent candidate could serve as the focal point for a group of voters who decided that they were dissatisfied with the choices within the two major parties. "[T]his disaffected 'group' will rarely if ever be a cohesive or identifiable group until a few months before the election." *Id.* at 791, 103 S.Ct. 1564.

Defendant points out that the Arizona statute sets a deadline 130 days from the election, nearly half that of the 229 days struck down in *Anderson*, and applies equally to all candidates, whether they are affiliated with qualified or non-qualified parties. However, candidates of qualified

parties are not required to collect any votes before that date. A.R.S. § 16–344 merely requires the chairmen of state committees of qualified political parties to appoint their party's candidates for the office of presidential elector and file nominating papers naming the candidates on the same day the candidates of non-qualifying parties must submit their nomination petitions.

Defendant also points out that if potential candidates are unable to collect sufficient signatures to be printed on the ballot, they still have an alternative means of gaining ballot access through write-in procedures, which requires no petitions or signatures, just forms submitted by fourteen days prior to the election. A.R.S. § 16–312.

"The realities of the electoral process, however, strongly suggest that 'access' via write-in votes falls far short of access in terms of having the name of the candidate on the ballot." *Lubin,* 415 U.S. at 719 n. 5, 94 S.Ct. 1315. Write-in status unarguably allows ballot access, but it requires voters to be aware of their ability to add a name not printed, to remember the write-in candidate's name, and to take the affirmative steps of carrying a pen into the voting booth and writing the name on the ballot. "[T]he intimation that a write-in provision ... would constitute 'an acceptable alternative' appears dubious at best." *Id.; see also Anderson,* 460 U.S. at 799 n. 26, 103 S.Ct. 1564 ("We have previously noted that this opportunity [to cast a write-in vote] is not an adequate substitute for having the candidate's name appear on the printed ballot.").

The United States Supreme Court upheld a Hawaii prohibition on write-in candidates. *Burdick,* 504 U.S. at 436–37, 112 S.Ct. 2059. In *Burdick,* the Court noted the negligible burden the prohibition imposed on candidates because of the ease with which candidates could get on the ballot, making write-in access unnecessary. The Hawaii statutory scheme included a requirement of fifteen or twenty-five signatures, depending on the office sought,

and a cutoff date for nominating petitions of two months prior to the open primary election in September when a voter could vote for any party's candidate. "Consequently, any burden on voters' freedom of choice and association is borne only by those who fail to identify their candidate of choice until days before the primary." *Burdick,* 504 U.S. at 436–37, 112 S.Ct. 2059. The Court gave little weight to the interest the candidate and his supporters may have in making a late rather than an early decision to seek independent ballot status. *See Id.* at 437, 112 S.Ct. 2059 (citing *Storer,* 415 U.S. at 736, 94 S.Ct. 1274, in which the Court stated that the states' interest in preventing splintered parties and unrestrained factionalism outweighs the interest the candidate and his supporters may have in making a late rather than an early decision to seek independent ballot status.).

A requirement of 25 or 200 signatures (depending on the office sought) and a cutoff for filing minor party candidacy papers 75 days before the election and 30 days before major party candidates had to announce their candidacies was upheld by the Ninth Circuit in *Libertarian Party of Washington,* 31 F.3d at 762–63. The Ninth Circuit based its decision on three differences from *Anderson:* (1) the minor party candidates are required to announce only one month earlier than major party candidates, (2) the difficulty of obtaining 25–200 signatures approximately 75 days before the election is extremely different than 5,000 signatures five months before election, and (3) unlike *Anderson,* all three candidates announced and filed on time. In *Munro,* the Libertarians cited to no instance in which any candidate had ever been denied access to the Washington ballot. *See Libertarian Party of Washington,* 31 F.3d at 763.

The Eleventh Circuit Court of Appeals found that an Alabama statute requiring signatures of at least one percent of the qualified electors by 60 days before the primaries, April 6, posed a significant bur-

den and did not serve any compelling state interest. *See New Alliance Party of Alabama v. Hand*, 933 F.2d 1568 (11th Cir. 1991). On the other hand, a Florida statute requiring minor party presidential candidates to submit petitions containing one percent of the registered voters, approximately 60,312 signatures, 110 days prior to the November general election (July 15) was upheld. *See U.S. Taxpayers Party of Florida v. Smith*, 871 F.Supp. 426, 432 (N.D.Fla.1993). In a recent action in the district court of Nevada, the court held that a June 10th deadline combined with a requirement of 3% of the vote cast in the previous election excessively burdened its citizen's First and Fourteenth Amendment. *See Fulani v. Lau*, CIV–92–535–ECR(1992).

A review of prevailing case law indicates that the following regulations are constitutional: (1) a cutoff date of 60 days prior to the September primary election combined with a nominal signature requirement and no write-in availability, *Burdick*, 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245, (2) a cutoff date of approximately July 4th combined with a nominal signature requirement, *Libertarian Party of Washington*, 31 F.3d 759, (3) a July 15th cutoff date with a one percent signature requirement, *U.S. Taxpayers Party of Florida*, 871 F.Supp. 426. On the other hand the following regulations were found unconstitutional: (1) a requirement of 1% of qualified electors combined with an April 6th deadline, *Hand*, 933 F.2d 1568, (2) a requirement of signatures from 3% of voters and a June 10th deadline, *Fulani v. Lau*, CIV–92–535–ECR, and (3) a March deadline 229 days before the election with no write-in provision, *Anderson*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547.

Constitutional challenges cannot be resolved by any "litmus-paper test" that will separate valid from invalid restrictions; there is "no substitute for the hard judgments that must be made." *Storer*, 415 U.S. at 730, 94 S.Ct. 1274. The court must determine if the challenged laws "freeze" the status quo by effectively barring all candidates other than those of the major parties. *See New Alliance Party of Alabama*, 933 F.2d at 1573. Although the June 27 deadline is the third or fourth earliest in the nation, the date in and of itself may not severely burden candidates of non-qualified parties. Nonetheless, constitutionality of the June 27th deadline must be determined as a part of the entire scheme regulating ballot access, not in isolation. *See Libertarian Party of Washington*, 31 F.3d at 761–62.

2. *Signatures equal to 3% of registered voters in non-qualified parties in last election*

Any fixed percentage requirement is necessarily arbitrary. *See American Party of Texas v. White*, 415 U.S. 767, 783, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974). The Court in *White* upheld a requirement of signatures of 1% of the total number of votes cast in the preceding gubernatorial election, or 22,000, to get on the general election ballot. Also upheld was Pennsylvania's requirement of 2% of the largest number of votes cast for any candidate in the prior election, or 56,641. *See Patriot Party of Pennsylvania*, 826 F.Supp. at 930, 939.

In *Jenness*, the United States Supreme Court upheld a Georgia law requiring signatures of 5% of the total of registered voters in the last election, but a voter of any party could sign as many nominating petitions as he wanted. *Jenness*, 403 U.S. at 438–39, 91 S.Ct. 1970. The Court also found that the requirement of signatures equal to 5% of the total voters who voted at the last general election was not too severe on its face (and candidates had to obtain 325,000 signatures in 24 days). *See Storer*, 415 U.S. at 739, 94 S.Ct. 1274.

■ It is clear that in and of itself, the requirement of 3% of the voters who were not members of qualified parties, in this case 7,813 signatures, is not a severe burden. It is a well-settled principle that states may require a showing of a "modicum of support" to place a minor party's candidates on the ballot. *See Jenness*, 403

U.S. at 442, 91 S.Ct. 1970. Percentages larger than 3%, and of entire totals of registered voters rather than Arizona's smaller number of voters, not affiliated with major parties, have been upheld. Nonetheless, constitutionality of the requirement that 3% of the voters, who were not members of qualified parties, must be determined as a part of the entire scheme regulating ballot access, not in isolation. *See Libertarian Party of Washington,* 31 F.3d at 761–62

### 3. *Petition signors cannot belong to a qualified party*

■ The court is unaware of any other statute in any other state that prohibits voters affiliated with major parties from signing a nomination petition for an independent party's candidate. Neither Plaintiffs nor Defendant have submitted any case authority on any similar statute. In fact, Plaintiff alleges that in this country's entire history, only one other state has ever had such a statute. From 1918 to 1949, Louisiana prohibited voters registered as members of the Republican or Democratic parties from signing petitions to place an independent or third-party candidate on its ballot. During that time period, no independent or third-party statewide or federal candidate, including a 1924 Progressive Party candidate who appeared on the ballot in every other state, was able to get a place on the Louisiana ballot. (Pls.' Mot. at 11.) Moreover, Louisiana's ballot access laws were far less restrictive than Arizona's current law in two ways: Louisiana allowed independent candidates until September to file nominating petitions while Arizona's deadline is June 27, and Arizona requires approximately 7,813 signatures while Louisiana only required 1,000. Defendant argues that Louisiana's statute from nearly 50 years ago is irrelevant. Plaintiffs assert that, given the dismal historical record of a similar statute, they should not have to wait through numerous election cycles in Arizona before their constitutional rights are vindicated.

The vast majority of voters in Arizona are registered to the qualified parties. Only 13.2% of the registered voters in Arizona in 1996 were unaffiliated, or affiliated with non-qualified parties. Thus, Arizona excludes 86.8% of the electorate from nominating independent candidates, unless they disaffiliate from their current political parties. (PSOF at ¶ 37.) Only about 15.8% of the eligible voters voted in the February 1996 presidential preference election (Arizona's equivalent of a primary election). Thus, even if Arizona had excluded those voters from signing nominating petitions, there were still over 1.5 million voters, or about 71% of the total number of registered voters, belonging to qualified parties who did not vote in the primary election but were prevented from signing a petition that would allow an independent candidate to appear on the general election ballot. (PSOF at ¶¶ 37–39.) Plaintiffs were therefore prevented from seeking the support of 86.8% of Arizona's voters, the large majority of whom did not vote in the presidential preference election for whom signing a nomination petition would have been their sole pre-general election "voice".

Plaintiffs claim that difficulty of finding non-affiliated voters severely burdened their ability to obtain signatures. Defendant argues that Plaintiffs could have obtained, but did not, a list of voters who did not belong to qualified parties, and that Plaintiffs and their party's volunteers were not diligent in their campaign efforts. Defendant also argues that signatures were only gathered in two counties, Pima and Maricopa, the most densely populated counties, and the total burden on each petition gatherer was a mere 5 signatures per day. Defendant further asserts that only four of the eight Green Party candidates actually circulated petitions. Moreover, Defendant argues that two state legislative candidates did gain access to the general election ballot pursuant to A.R.S. § 16–341. (DSOF at ¶ 61.)

Plaintiffs' Statement of Facts outlining the actions that were taken during 1996 to get the campaign off the ground presents a

picture of a small number of people working to get the Green Party candidates on the ballot, admittedly struggling and ultimately failing. As has already been mentioned, independent candidacies often do not gather steam until mid-year when major party platforms are more established, voter interest increases, and disenfranchised voters begin looking outside the major parties for alternatives. Although Defendant is correct that had Plaintiffs started earlier, they would have had more time in which to obtain signatures, an earlier start would not necessarily have guaranteed sufficient signatures. Further, the late start does not necessarily reflect a lack of due diligence, nor does the fact that some of the elector candidates did not personally obtain any signatures. It is reasonable that campaign volunteers would focus their efforts in the two counties where they could find the most people.

The restriction on party affiliation of potential signors places a significant burden on non-qualified party candidates even though petitions don't have to be notarized, there is no geographical limitation, signatures can count for up to 8 candidates, and lists of eligible signors are available for a price. This is especially true because in many cases independent candidates are less likely to have a strong financial base, at least early in a campaign, with which to purchase a list of those voters eligible to sign nomination petitions.

Plaintiffs claim that the Green Party did not have enough funds available in their small budget to purchase a list and do a direct mailing. Additionally, it was antithetical to Ralph Nader's goals and ideals to collect money from political action groups. Their only option was to go out into the community and talk to people wherever crowds gather, to find eligible petition signors. Plaintiffs argue that the United States Supreme Court has made it clear that states may not constitutionally impose even far lower economic barriers to ballot access. *See Bullock,* 405 U.S. at 146, 92 S.Ct. 849 (financial test of a candidate's seriousness is "extraordinarily ill-fitted to that goal"). Defendant argues that the necessity of expending money in connection with political campaigns has also been recognized by some courts. *See Libertarian Party of Florida v. State of Florida,* 710 F.2d 790, 794–95 (11th Cir. 1983) (upholding a charge of 10 cents per signature to cover the costs of verifying the signature, but they use random sampling techniques which reduce the number of signatures checked and therefore the cost stating: "That minor parties must incur some expenses in accumulating the necessary signatures to qualify for the ballot does not constitute an equal protection violation."). Nonetheless, the burdens of A.R.S. § 16–341 are not constitutionally palatable simply because one of the burdens could be avoided through greater financial expenditures.

Although Arizona's restriction on major-party affiliated voters is unique in the last half-century, numerous courts have concluded that the Constitution does not permit states to require voters to change their party affiliation in order to nominate independents or minor party candidates. *See Libertarian Party of Kentucky v. Ehrler,* 776 F.Supp. 1200, 1206–08 (E.D.Ky.1991) (declaring unconstitutional and severing from a statute a requirement that minor party candidates submit a nominating petition signed by only members of the same political party as candidate); *Workers World Party v. Vigil–Giron,* 693 F.Supp. 989, 994–98 (D.N.M.1988) (striking as unconstitutional a state law requiring voter to change party affiliation in order to sign petition to form a new party); *Libertarian Party of Nevada v. Swackhamer,* 638 F.Supp. 565 (D.Nev. 1986) (declaring unconstitutional a state law requiring petition language that implied that a voter must change party affiliation to sign petition); *Consumer Party v. Davis,* 606 F.Supp. 1008, 1018–20 (E.D.Pa. 1985) (recognizing that it is exceedingly difficult to forego advantage of affiliation with Republicans and Democrats and granting a preliminary injunction against enforcement of state law that required party membership to sign a candidate nomination petition); *Libertarian Party of*

*Nebraska v. Beermann,* 598 F.Supp. 57, 63 (D.Neb.1984) (declaring unconstitutional a requirement that persons desiring to sign a petition to form a new party affiliate with the new party and noting that "many voters have no desire to change basic political affiliations, but neither do they vote a straight political ticket in general elections"); *Libertarian Party of South Dakota v. Kundert,* 579 F.Supp. 735, 738–39 (D.S.D.1984) (declaring unconstitutional a state law limiting voters who may petition to place a minority candidate on the ballot to those voters who intend to join the party and noting that the law burdens the right to "vote effectively of persons who wish to consider the Party's candidates but do not wish to join the Party"); *N.C. Socialist Workers Party v. N.C. State Bd. Of Elections,* 538 F.Supp. 864 (E.D.N.C.1982) (preliminary injunction granted to prevent enforcement of law making an act of signing a petition to place party on ballot an act of disaffiliation with current party). Furthermore, while Arizona may enact laws that protect partisan primaries from outside intrusion by voters either unaffiliated or affiliated with a different party, Arizona may not constitutionally preclude the Democrats and Republicans from inviting independents to participate in their primary. *Compare Nader v. Schaffer,* 417 F.Supp. 837, 845 (D.Conn.1976) *with Tashjian v. Republican Party of Conn.,* 479 U.S. 208, 215 n. 6, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986). If Arizona may not prevent Republicans or Democrats from including independents in their primaries, there is no reason to believe that Arizona can prevent independents from seeking the support of registered Republicans and Democrats as long as those partisan voters have not already performed a nominating act.

The unnecessary cost of obtaining the list of voters who do not belong to qualified parties combined with the small percentage of voters available to sign the petitions (13.2%) and the difficulty of finding these voters creates a severe burden on voters' and candidates' First and Fourteenth Amendment rights. Additionally, Arizona may not require voters to change their party affiliation as a condition of nominating independent or minor party candidates. Historically in Louisiana and Arizona this restriction "freezes" the status quo by effectively barring all candidates for national office other than those of the major parties. Therefore, in light of entire Arizona scheme regulating ballot access the restriction on petition signors' party affiliation creates a severe burden on voters and candidates constitutional rights.

*Conclusion*

In combination, the June 27 deadline (the third earliest in the nation), the mandated non-qualified party status of nomination petition signors (the only one in the nation), and the requirement of 3% of the voters in the last election who were not affiliated with a qualified party impose severe burdens on voters and non-qualified party candidates. To justify such an imposition, the regulation must be narrowly drawn to advance a state interest of compelling importance. *See Timmons,* 520 U.S at 357, 117 S.Ct. 1364; *see also Norman v. Reed,* 502 U.S. 279, 289, 112 S.Ct. 698, 116 L.Ed.2d 711 (1992). Although the early filing deadline and the 3% signature exacerbate the effects of the ban on support from major party-affiliated voters, Plaintiff does not argue that the early filing deadline or the 3% requirement standing alone would offend the Constitution. Thus, the Court will rule only on the constitutionality of A.R.S. § 16–341(C), the restriction on support from major party-affiliated voters.

**B. State's Interest**

In the context of a Presidential election, state-imposed restrictions implicate a uniquely important national interest. The State has a less important interest in regulating Presidential elections than statewide or local elections, because the outcome of the former will be largely determined by voters beyond the State's boundaries. *See Anderson,* 460 U.S. at 795, 103 S.Ct. 1564.

The Supreme Court has stated, however, that there is surely an important state

interest in requiring some preliminary showing of a significant modicum of support before putting a name on the ballot. *See Jenness,* 403 U.S. at 442, 91 S.Ct. 1970. States also have an interest in regulating elections if they are to be fair, honest and if some sort of order, rather than chaos, is to reign. *See Anderson,* 460 U.S. at 788, 103 S.Ct. 1564. Defendant argues that the reasonable, nondiscriminatory regulations that form Arizona's ballot access scheme protect those interests as well as an interest "in avoiding confusion, deception, and even frustration of the democratic process at the general election." *Jenness,* 403 U.S. at 442, 91 S.Ct. 1970.

*Petition signors cannot belong to a qualified party*

A.R.S. § 16–341(C) prohibits voters affiliated with qualified parties, whether or not they voted in a presidential preference election, from signing a nominating petition for a candidate affiliated with a non-qualified party. Defendant argues that this statute protects the state's interests in the prevention of splintered parties and reduction in the probability of frivolous candidates. Defendant further argues that the United States Supreme Court has upheld statutes which prohibit voters who voted in the primary election from signing another candidate's nominating petition, *see White,* 415 U.S. at 785, 94 S.Ct. 1296, and that states may also establish waiting periods before voters may change their registration and participate in another party's primary election. *See Id.* at 786, 94 S.Ct. 1296; *Storer,* 415 U.S. at 741, 94 S.Ct. 1274.

In *Storer v. Brown,* 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714, and *American Party of Texas v. White,* 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744, the Supreme Court upheld ballot access restrictions that prohibited voters from both voting in a primary and signing a nominating petition for a candidate for a particular office. These restrictions were "nothing more than a prohibition against any elector casting more than one vote in the process for nominating candidates of a particular office." *White,* 415 U.S. at 785, 94 S.Ct. 1296. Defendant alleges that the party affiliated voter restriction is no more onerous than restrictions upheld in *Storer and White.* However, both *Storer* and *White* allowed voters to choose whether to participate in the partisan or nonpartisan nominating process. In contrast, A.R.S. § 16–341 locks voters into partisan and nonpartisan categories and denies major party voters the choice of alternatives that were available in *Storer* and *White.* Defendant also compares A.R.S. § 16–341 to statutes such as the one upheld in *Nader v. Schaffer,* 417 F.Supp. 837 (D.Conn.1976), which were designed to prevent intrusion by non-party members into party affairs. *See also Rosario v. Rockefeller,* 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973). The portion of A.R.S. § 16–341 that Plaintiffs challenge does not prevent "intrusion" into the affairs of recognized parties. Instead, it prevents external competition from independent candidates by preventing voters dissatisfied with party choice from supporting a preferred minority or independent candidate. Thus, A.R.S. § 16–341(C) creates a severe burden on voters and candidates constitutional rights. Defendant has made no showing that this section is either necessary or the least restrictive means to prevent splintered parties, reduce the probability of frivolous candidates, avoid ballot clutter or eliminate voter confusion.

*CONCLUSION*

Although the restrictions imposed on Plaintiffs by A.R.S. § 16–341 are non-discriminatory, taken as a whole they severely burden Plaintiffs' First and Fourteenth Amendment rights. Plaintiffs concede that if A.R.S. § 16–341(C), the restriction on support from major party-affiliated voters, is struck down, the early filing date or the 3% requirement standing alone would not offend the Constitution. The state has failed to make a showing that A.R.S. § 16–341(C) is narrowly tailored to advance a compelling state interests. Thus, the Court finds that A.R.S. § 16–341(C), the requirement that signors of nomination pe-

titions not be members of qualified political parties, violates Plaintiffs' right to vote for the candidates of their choice, in violation of their right to equal protection and due process under the Fourteenth Amendment and their right to free speech/freedom of association under the First Amendment. Defendant should henceforth be enjoined from enforcing A.R.S. § 16–341(C), the requirement that signors of nomination petitions not be members of qualified political parties.

Accordingly,

IT IS **ORDERED** that:

1. Defendant's Motion for Summary Judgment Doc. # 37 is **DENIED;**

2. Plaintiffs' Motion for Summary Judgment Doc. # 44 is **GRANTED** to the extent specified in this Order;

3. Defendant is enjoined from enforcing the second sentence of A.R.S. § 16–341(C); the requirement that signors of nomination petitions not be members of political parties;

4. This action is **DISMISSED WITH PREJUDICE.**